**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C - Atlanta

JUN 1 4 2004 *d/apr*

LUTHER... ., Clerk
By: *Whitney* Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | FILE NO. **1 04 - V 1708** |
| CLYDE BERGEMANN, INC., | ) ) | **RWS** |
| Defendant. | ) ) | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

COMES NOW Plaintiff Diamond Power International, Inc.

("Diamond Power") and, pursuant to Fed. R. Civ. P. 65 and other applicable

law, and moves for entry of a temporary restraining order and preliminary

injunction against Defendant Clyde Bergemann, Inc., ("Bergemann").

Diamond Power seeks relief in the form of the proposed Order attached to

Diamond Power's memorandum in support hereof, filed contemporaneously

herewith. In support of its motion, Diamond Power relies on the

Declarations of Jeff Koksal, Lou Stang, Greg Fordham, and upon the

argument and citation of authority set forth in Diamond Power's

memorandum of law.

2

Respectfully submitted this 14th day of June, 2004.

ALSTON & BIRD LLP

By: _____

Warren R. Hall, Jr.
Georgia Bar No. 319405
F. Skip Sugarman
Georgia Bar No. 690773
Brett E. Coburn
Georgia Bar No. 171094
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
(404) 881-7777

ATTORNEYS FOR DIAMOND
POWER INTERNATIONAL, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | FILE NO. _____ |
| CLYDE BERGEMANN, INC., | ) ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing Plaintiff's

Motion for Temporary Restraining Order and Preliminary Injunction on all

parties to this action by hand delivery addressed as follows:

| | |
|---|---|
| Hans Schwade Chief Executive Officer Clyde Bergemann, Inc. 4015 Presidential Pkwy Atlanta, Georgia 30340 | Jeffrey D. Mokotoff Leanne C. Mehrman Ford & Harrison 1275 Peachtree Street, N.E. Suite 600 Atlanta, GA 30309 |

This the 14ᵗʰ day of June, 2004.

_____
Warren R. Hall Jr.
Georgia Bar No. 319405

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 1 4 2004   d/epn

LUTHER D. THOMAS, Clerk
By: JkPinckny Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER                    )
INTERNATIONAL, INC.              )
                                 )
            Plaintiff,           )
      v.                         )        CIVIL ACTION
                                 )
CLYDE BERGEMANN, INC,            )        FILE NO. 1 04 CV 1708
                                 )
            Defendant.           )                 RWS
_____)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.      INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and other applicable law, and for the reasons set forth herein, Plaintiff Diamond Power International, Inc. ("Diamond Power") respectfully requests that the Court enter a temporary restraining order and interlocutory injunction against Defendant Clyde Bergemann, Inc. ("Defendant"). In support of this Motion for Temporary Restraining Order and Preliminary Injunction, Diamond Power shows that Defendant has misappropriated trade secrets of Diamond Power and that Defendant's use of Diamond Power's trade secrets will cause irreparable harm to Diamond Power if not enjoined by this Court.

w/2

Pending expedited discovery and the filing of a motion for preliminary injunction, Diamond Power seeks an order providing the following limited relief:

1.  Enjoining Defendant effective immediately from using or disclosing in any way any information contained in documents or computer files originating from Diamond Power's computer system including, without limitation, the following documents:

    a.  Cost.data.xls report;

    b.  Diamond Power's PowerTrain purchaser spreadsheet;

    c.  Diamond Power's "Parts Comparison Doc";

    d.  The Diamond Power Hardware Book; and

    e.  Invoiced order summaries.

2.  Enjoining Defendant from altering, erasing, deleting, destroying any computer, computer drive, computer disk, backup tape, or other information containing medium currently in its possession, custody or control, or in any way spoliating evidence pertaining to the allegations in Diamond Power's Complaint; and

3.  Directing Defendant to permit, within 3 business days of receipt of the Court's order, a computer examiner, not employed with Diamond Power, to access and make two (2) digital images of Defendant's computer servers

hosting Defendant's "user directories" (the "BDC" server), Defendants sales

share (the "PDC" server), and Defendant's e-mail system (the "CBA01"

server).  For each server identified above, Defendant shall also make

available for digital imaging as set forth above, each and every "backup

tape" maintained by Defendant for all periods of time from September 1,

2003, through the present. One of the digital images made pursuant to the

order shall be filed with the Court as evidence; the remaining image shall

be delivered to counsel for Diamond Power for examination, provided that

counsel for Diamond Power shall not reveal the contents of the images to

any employee of Diamond Power unless it is pursuant to an order of the

Court or pursuant to express written permission by counsel for Defendant.

If Defendant desires a set of digital images identical to those prepared as

ordered, one shall be provided by the computer examiner; provided that

Defendant shall be required to pay for its copy of the images and a one

third (1/3) share in the total expense of the imaging process.

4.    Providing for expedited written discovery and depositions.

## II.    FACTUAL BACKGROUND

### A.    The Parties

Diamond Power is in the business of providing boiler cleaning systems and products primarily to the pulp and paper, chemical, and electric utility industries. (Declaration of C.G. Koksal ¶ 3.)[1]  The cleaning systems, called "sootblowers," and their related systems are designed to keep industrial boilers operating at peak efficiency. (Id.)[2]

Defendant is a major competitor of Diamond Power.  (Koksal Dec. ¶¶ 9 & 22.) The two companies are involved in the same lines of business and regularly compete for business opportunities in the sootblower business.  (Id.)  In fact, Diamond Power and Defendant represent by far the dominant companies in the sootblower industry with the two companies collectively comprising essentially the entire industry.  (Id.)  Diamond Power operates a service center facility in Atlanta.  (See Koksal Dec. at ¶ 4.)

### B.    Wayne Davidson

At some point in October 2004, Defendant formally hired Wayne Davidson ("Davidson") as its Manager of Rebuild Activities.  Before he began working for

---

[1]    The Declaration of C.G. Koksal is attached hereto as Exhibit A and will be referred to hereinafter as "Koksal Dec. at ¶."

[2]    The Babcock & Wilcox Company ("B&W") is Diamond Power's parent.  (Koksal Dec., ¶ 14.)

Defendant, Davidson worked for Diamond Power in the position of Manager of U.S. Service Center Operations. (Koksal Dep. ¶ 4.) Davidson held this position from approximately June 2002 until his separation of employment with Diamond Power effective October 31, 2003. (Id.) In this position, Davidson was responsible for supervising Diamond Power's three service centers located in metropolitan Atlanta, Chicago, and Seattle. (Id.) Diamond Power's regional service centers provide maintenance and rebuilding services for sootblowers and related equipment. (Koksal Dec. ¶ 5.) As Manager of U.S. Service Center Operations, Davidson was a point of centralized control over all three service center facilities in the United States and reported to Diamond Power's General Manager of Sales and Service. (Id.) In this capacity, Davidson was responsible for operational performance and expense control for each of the service centers, managing inventory levels at the service centers, and assisting in the sales process to provide customers of Diamond Power with analysis and recommendations, evaluating alternatives to new equipment purchases, including rebuilding and maintenance programs offered by Diamond Power through its service center. (Id.)

- 5 -

When Davidson left Diamond Power, he returned his company-owned laptop computer ("the Davidson laptop") (Declaration of Lou Stang, ¶ 11.)[3]  As is Diamond Power's normal practice with departing employees, Diamond Power's IT Department examined the Davidson laptop upon its return.  (Stang Dec. ¶ 11.)  When it examined the Davidson laptop, the IT Department discovered that significant portions of the Davidson laptop's email system and all word and spreadsheet documents on the Davidson laptop had been deleted, erased, or overwritten.  (Id.)

Diamond Power then commissioned a forensic computer examination of the Davidson laptop.  (Stang Dec. ¶ 12.)  The forensic examination revealed that Davidson had accessed data, records, and documents stored on the Diamond Power computer network, Diamond Power's Oracle database, or the Davidson laptop and copied or somehow transferred files to an external "zip" drive attached to, but external from, the Davidson laptop.[4]  (Id.)  Because Diamond Power did not provide an external zip drive to Davidson for his use as an employee of Diamond Power, the zip drive must have been acquired by Davidson from some source other than Diamond Power.  (Id.)

---

[3]     The original Declaration of Lou Stang was filed with the Court attached to Diamond Power's Memordandum of Law in Support of Its Motion for Injunctive Relief in the matter of Diamond Power Int'l, Inc. v. Davidson, Case No. 1:04-cv-0091-RWS, currently pending before Judge Story.  A true and correct copy of Mr. Stang's declaration is attached hereto as Exhibit B and will be referred to hereinafter as "Stang Dec., ¶."

[4]     An external zip drive is a means of storing data or information outside of the computer hard drive itself.  (Stang Dec., ¶ 12.)

Davidson did not turn in an external zip drive to Diamond Power as part of his computer equipment when he turned in his company laptop. (Id.)

By copying files and documents to his external zip drive, Davidson retained access to the information after returning the Davidson laptop to Diamond Power and after Davidson could no longer access Diamond Power's computer network or Oracle database system. (Stang Dec. ¶ 13.) In other words, by copying information to his zip drive, Davidson retained access to and use of the information after his separation from employment. (Id.)

C.   Diamond Power's Documents Appear on Defendant's Computer System.

After Diamond Power determined that Davidson apparently had copied and retained certain of its documents, Diamond Power sought immediate injunctive relief against Davidson. Accordingly, Diamond Power filed in this Court a Complaint against Davidson, which is styled Diamond Power International v. Wayne Davidson, Civil Action No. 1:04-CV-91-RWS, alleging violations of the Georgia Trade Secrets Act, breach of contract, and a number of other claims. In addition, Diamond Power filed a Motion for Temporary Restraining Order and Preliminary Injunction against Davidson, and in this Motion, sought an order directing Davidson to return any property of Diamond Power, enjoining Davidson from disclosing any Diamond Power information to any third party, enjoining Davidson from erasing or otherwise altering any computer

- 7 -

information relating to Diamond Power, and directing Davidson to produce to Diamond Power any computer equipment under his control.

On January 14, 2004, the Court entered a Consent Restraining Order against Davidson. Among other relief, the Court ordered that Davidson make available for digital imaging computer equipment in his custody or under his control. Pursuant to this Order, digital images of Davidson's computer equipment, including an IBM ThinkPad Notebook Computer (the "ThinkPad Notebook Computer"), were created and filed with registry of the Court. Defendant had provided the ThinkPad Notebook Computer to Davidson when he formally commenced employment with Defendant in late October 2003.

Subsequently and pursuant to Court order, one copy of the digital image of the ThinkPad Notebook Computer was made available to Diamond Power for examination. Upon receipt of this computer, Diamond Power retained a computer forensic expert, Gregory L. Fordham, to analyze the contents of the ThinkPad Notebook Computer. (Fordham Dec. ¶ 3.)[5] Fordham examined and retrieved deleted, erased, or overwritten files and other information from the computer equipment, including the ThinkPad Notebook Computer. (Id.)

_____

[5]    The Declaration of Gregory L. Fordham is attached hereto as Exhibit C and will be referred to hereinafter as "Fordham Dec. at ¶."

Fordham's examination yielded two important discoveries.  First, Fordham uncovered several e-mail communications from Davidson to other employees at Defendant in which Davidson knowingly and purposefully attached and sent Diamond Power proprietary documents and information to Defendant's employees.  (See Fordham Dec. ¶ 7.)  In these emails, Davidson expressly discussed using Diamond Power's trade secrets and confidential information to "convince[] these or any other customer to switch to Clyde Bergemann for rebuild services" and specifically mentioned certain alleged problems that certain customers were experiencing with Diamond Power's products.  In addition, Davidson communicated a variety of confidential information and attached the following two documents:  (1) PowertTrain purchaser spreadsheet and (2) Parts Comparison Doc. (Id.)

Second, Fordham found conclusive evidence that that several confidential and proprietary Diamond Power documents have actually been copied to and saved on Defendant's internal computer system.  (Fordham Dec. ¶¶ 8 & 9.)   In his examination of the ThinkPad Notebook Computer, Fordham found a number of "link files."  (Id.)  A computer creates a "link file" when the computer accesses another computer, such as a network server.  (Id.) The link file indicates the connection between the two computers and reflects what functions where performed while the computers were connected.  (Id.) Specifically, the link file gives the name and computer "address" of the files accessed by

- 9 -

the computer on which the link file exists.  (Id.)  Therefore, a link file shows evidence of a computer file, such as a document or worksheet, that existed on the computer accessed by the remote computer.  (Id.)

The link files identified on the hard drive of the ThinkPad Notebook Computer indicate that the following documents existed on Defendant's server: (1) the "cost.data.xls"; (2) Diamond Power Hardware Book; and (3) Invoiced Order Summaries.  (See Fordham Dec. ¶¶ 8-9 & Exh. E.)   All of these documents have been identified as Diamond Power documents.

D.    The Importance of the Documents on Defendant's System and Diamond Power's Efforts to Keep These Documents Secret.

The Diamond Power documents that appear on Defendant's system are extremely important to Diamond Power's business.  (Koksal Dec. ¶¶ 9-12.)  Perhaps the most sensitive and valuable document that Diamond Power found on Defendant's system is the cost.data.xls.  (Koksal Dec. ¶ 22.)  This document is a spreadsheet that can be generated by Diamond Power's Oracle computer system.  (Id.)  This spreadsheet (which would exceed 300 pages if printed) lists hundreds of Diamond Power's equipment parts and the total cost of each part.  (Id.)  In addition, the cost.data spreadsheet breaks down the total cost by identifying the components of the cost, including raw material cost and overhead ratio.  With access to such information, a competitor would not only know the precise costs of the parts identified in the spreadsheet but would also be able to compute

- 10 -

the cost of any piece of Diamond Power equipment by computing Diamond Power's

overhead and attributing that figure to other products. (Id.) The "PowerTrain"

purchaser's spreadsheet identifies Diamond Power customers who have purchased

Diamond Power's "PowerTrain carriage system," which is Diamond Power's newest and

most advanced product. (Id.) Most of these customers currently have only rebuilt a

very small percentage of their stootblowers with the PowerTrain carriages. (Koksal

Dec. ¶¶ 8-11.) As most of these customers operate dozens of sootblowers, knowing the

identity of these customers would allow a competitor, such as Defendant, to target these

entities as they rebuild their other sootblowers. (Id.) Having this information would

also allow Defendant to target specific customers with negative advertising about

Diamond Power's products. (Id.) Similarly, the "Parts Comparison Doc" specifically

outlines Diamond Power's sales and marketing approach with respect to certain products

and in relation to certain competitors, including Defendant. (Koksal Dec. ¶¶ 12-14.)

Thus, Defendant's possession of this document amounts to allowing Defendant access to

Diamond Power's "playbook" for competing in this very small marketplace. (Id.) The

Diamond Power Hardware book is a reference tool for all of Diamond Power's products.

The Hardware Book includes very precise details and product specifications of every

component of every piece of Diamond Power equipment. (Koksal Dec. ¶ 15.) Because

a large part of the business in which Diamond Power and Defendant compete involves

- 11 -

rebuilding sootblowers, the Hardware Book would allow Defendant to order

components meeting the exact specifications for Diamond Power equipment. (Id.)

Without the Hardware Book, Defendant would be left to guess regarding the

specifications for the components and would expose Defendant to the risk that the

components they replaced when rebuilding sootblowers would fail. (Id.) Finally, the

Invoiced Order Summaries are reports that can be generated by Diamond Power's

Oracle financial computer system. (Koksal Dec. ¶¶ 16-17.)   Such reports identify all

customers of Diamond Power and the amount of each customer's purchases over the

time period covered by the report. (Id.) Such reports can also generate information

about subgroups of Diamond Power's business to identify specific types of products

being purchases by each customer. (Id.) Obviously, the information contained in

Invoiced Order Summaries would be invaluable to a competing company by allowing

them to focus marketing and sales activies based on past sales patterns. (Id.)

Because of the significant competitive value of this information, Diamond Power

does not disclose any of the information from the documents that are on Defendant's

system to anyone outside of Diamond Power or its parent corporation. (Koksal Dec. ¶¶

14-22.) Diamond Power's internal computer network (the "network") is made available

to most, but not all, Diamond Power employees. (Stang Dec. ¶ 5.) Access is expressly

limited to those employees who are provided a login and password which permits entry

into the network. (Id.) Such employees are considered authorized "users" of the

network. (Id.) Each network user is assigned a profile which permits the particular user

to access certain applications and drives on the network. (Id.) All network users are not

given access to all areas of the network. (Id.)

Additionally, information contained within the network is subject to an extra

layer of password protection. (Stang Dec. ¶ 6.) For example, the database system

within the network called Oracle is available to only a limited group of network users.

(Id.) Access to Oracle is protected by a user name and password assigned by the

information technology ("IT") department. (Id.) These user names and passwords are

provided only to Diamond Power network users with a need to access the Oracle

system. (Id.) Moreover, access to the Oracle system is further limited in that

employees are permitted to access certain portions of the Oracle system to which it has

been determined that they need access.[6] (Id.)

In addition to the login and password protections for the protection of access to

the network and a second layer of password and user name protection for access to the

Oracle database system, the entire Diamond Power computer network is firewall

---

[6]     Out of approximately 500 total Diamond Power employees, less than ¾ are
network users. Thirty-four percent (34%) of Diamond Power employees have no access
at all to the Oracle system. Outside of the accounting department and three (3)
employees in the IT department, only eighteen (18) employees of Diamond Power had
access to the financial records in Oracle misappropriated by Davidson as recounted
above. (Stang Dec. ¶ 7.)

protected to prevent unauthorized access by unauthorized persons.  (Stang Dec. ¶ 8.)  As

an additional level of security, physical access to Diamond Power's operational

headquarters in Lancaster, Ohio, where its computer systems are housed, is limited by

regulations requiring all employees to wear and display identification badges while in

the office.  (Id.)  Visitors must identify themselves, sign in, and be accompanied while

in the offices.  (Id.)  After hours, access to Diamond Power's Lancaster office is

controlled by security guards who permit access only upon showing a valid company

identification badge.  (Id.)

     E.     Irreparable Harm to Diamond Power

The use or further disclosure of the Diamond Power information on Defendant's

computer system would irreparably harm Diamond Power by allowing Defendant to

generate and implement any number of sales strategies specifically using Diamond

Power's trade secrets.  (Koksal Dec. ¶¶ 9-22.)

     III.     ARGUMENT AND CITATION OF AUTHORITY

     A.     Standard for Issuance of Injunctive Relief

Temporary injunctive relief to preserve the status quo is appropriate where the

ordinary standards for the issuance of temporary injunctive relief are satisfied.  United

States v. State of Alabama, 791 F.2d 1450, 1459 (11th Cir. 1986) ("The purpose of a

preliminary injunction is to prevent irreparable injury so as to preserve the court's ability

- 14 -

to render a meaningful decision on the merits").  A temporary restraining order ("TRO") may be entered in advance of a full hearing whenever a plaintiff will suffer immediate and irreparable injury, loss, or damage before it is possible for the defendant to be heard in opposition to the Plaintiff's motion for preliminary injunction. Fed. R. Civ. P. 65; Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995). As shown below, the facts at hand establish that Diamond Power will suffer immediate and irreparable harm if Defendant is not ordered to disgorge itself of Diamond Power's trade secret and confidential information and is not enjoined from using this information belonging to Diamond Power for competitive activies.

The review of a district court's decision to grant or deny a temporary restraining order is very narrow in scope, highly deferential, and will only be reversed upon a finding of a clear abuse of discretion. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1209 (11th Cir. 2003); Siegel v. Lepore, 234 F.3d 1163, 1175 (11th Cir. 2000).  To support a TRO or preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in a plaintiff's favor. Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1985).  A district court may issue a TRO or preliminary injunction when the moving party shows that:

1.    There is a substantial threat that the movant will suffer an
      irreparable injury if injunctive relief is not granted;

2.    The threatened injury to the movant outweighs the threatened
      harm the injunction may inflict on the respondent;

3.    There is a strong probability of success on the merits of the
      case; and

4.    The granting of the injunction will not disserve the public
      interest.

Four Seasons Hotels, 320 F.3d at 1210; Siegel, 234 F.3d at 1176; Tefel v. Reno, 180

F.3d 1286, 1295 (11th Cir. 1999).  A showing of irreparable injury is the *sine qua non*

of a request for injunctive relief.  Siegel, 234 F.3d at 1176.

Diamond Power's motion for temporary injunctive relief should be granted

because Defendant has violated the Georgia Trade Secret Act.

B.    There is a substantial likelihood that Diamond Power will prevail on the
      merits of its Trade Secrets Claim.

While proof of a substantial likelihood of success on the merits is the first

prerequisite to preliminary injunctive relief, it is not necessary for a plaintiff to

demonstrate a no-lose situation in order to obtain such relief.  "[A] court's conclusions

as to the merits of the issues presented on preliminary injunction are to be understood as

statements of *probable* outcomes."  B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit

- 16 -

Corp., 785 F. Supp. 222, 227 (D. Mass. 1991) (quoting Narrangansett Indian Tribe v.

Guilbert, 934 F.2d 4, 6 (1st Cir. 1991)); Roadway Express, Inc. v. Donovan, 603 F.

Supp. 249, 251 (N.D. Ga. 1985).

Diamond Power easily satisfies this element of the test for injunctive relief

because, as demonstrated below, Georgia law provides statutory protection of trade

secret information.  There can be no dispute that the information at issue falls under the

definition of trade secrets under Georgia law and that Defendant's possession of this

information constitutes misappropriation.

1.    There is a substantial likelihood that Diamond Power will prevail on
      the merits of its claim for violation of the Georgia Trade Secrets Act.

Diamond Power's documents that appear on Defendant's system are protected as

trade secrets under Georgia law.  The Georgia Trade Secrets Act ("GTSA") defines the

term "trade secret" as any information that (1) has actual or potential economic value to

its possessor because others who can obtain economic value by using or disclosing it

generally do not know it and cannot readily ascertain it by proper means; and (2) is the

subject of reasonable efforts under the circumstances to maintain its secrecy.  O.C.G.A.

§ 10-1-761(4).  The GTSA specifically provides for injunctive relief to protect not only

actual, but also "threatened misappropriation" of a trade secret.  O.C.G.A. § 10-1-

762(a).

The proprietary information at issue in this case satisfies both prongs of the trade secret definition. First, the information that appears on Defendant's system contains detailed information about customers of Diamond Power's PowerTrain system, information about Diamond Power's sales and marketing strategies, information about the precise specifications for Diamond Power's products, and reports identifying Diamond Power customers and the amounts they have spent on various products. Such customer identifying information together with sales strategies and precise product specifications (using product codes unique to Diamond Power) renders these documents quintessential trade secrets. Georgia courts have repeatedly held that tangible lists and computer files containing the identities of, and specific information about, particular actual customers, supplies, or vendors constitutes protectable trade secrets under the GTSA because the information has actual economic value and is not readily known to competitors. See DeGiorgio v. Megabyte Int'l, Inc., 266 Ga. 539, 540 (1996); Avnet v. Wyle Labs. Inc., 263 Ga. 615, 616-17 (1993); see also O.C.G.A. § 10-1-791(4) (including "product plans" and "financial data" and "financial plans" within the definition of trade secret under GTSA); Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1410 (11th Cir. 1998) ("Georgia defines trade secrets broadly to include non-technical and financial data."). As set forth in the Declaration of Jeff Koksal, none of the information contained in the documents on Diamond Power's

system are known to competitors and all of this information could be used by competitors, including Defendant, to compete unfairly by targeting Diamond Power's customers with marketing and sales strategies customized according to Diamond Power's sales information and by assisting Defendant to integrate itself seamlessly into projects involving Diamond Power products.  (Koksal Dec. ¶ 16.)

Second, Diamond Power has made reasonable efforts to keep this proprietary information secret.  As discussed in detail above, Diamond Power password protects and restricts access to both its internal computer network and Oracle database system. (Stang Dec. ¶¶ 5-6.)  Significant numbers of employees are not provided access to the network whatsoever and even a greater number have no access to the Oracle system. (Id. ¶ 7.)  Diamond Power utilizes additional security measures to protect unauthorized access to its entire computer network and restricts physical access to its offices where computer systems are housed.  (Id. ¶ 8.)  Moreover, Diamond Power requires all employees to execute non-disclosure agreements that prohibit employees from disclosing its proprietary information to anyone outside of Diamond Power.  (Koksal Dec. ¶ 24.)  Thus, Diamond Power can establish that all of the information copied to Davidson's zip drive has at all times been subject to reasonable efforts to maintain its secrecy.  See Avnet, 263 Ga. at 617 (holding that requiring employees to sign non-disclosure agreements constitutes a reasonable effort to maintain secrecy of

- 19 -

information); Tronitec v. Shealy, 249 Ga. App. 442, 448 (1991) (finding that evidence that employer controlled access to its facility where trade secret information was located would support jury finding that employer took reasonable steps to protect secrecy of information).

In order to establish a claim for misappropriation of trade secrets in violation of the GTSA, Diamond Power must also establish the misappropriation of the trade secrets. Camp Creek Hospitality Inns, Inc., 139 F.3d at 1410; TDS Healthcare Sys. Corp. v. Humana Hosp. Illinois, Inc., 880 F. Supp. 1572, 1582 (N.D. Ga. 1995). Here, the misappropriation of Diamond Power's trade secrets is beyond dispute because Diamond Power's sensitive documents have been found on Defendant's computer system.

Based on the foregoing, Diamond Power has demonstrated a substantial likelihood that it will prevail on its claim for misappropriation of trade secrets in violation of the GTSA.

C.   Diamond Power Will Suffer Irreparable Injury If Injunctive Relief Is Not Granted.

It is widely recognized that loss of confidential and proprietary information is not measurable in money damages and is thus considered "irreparable harm." O.C.G.A. § 10-1-762(a) (expressly allowing for injunctive relief for actual or threatened misappropriation of trade secret information); Specialty Chemicals & Serv., Inc. v.

- 20 -

Chandler, No. 1:87CV-2338MHS, 1988 WL 618583, at *5 (N.D. Ga. Sept. 29, 1988) (finding that the mere "[t]hreat of disclosure, destruction or dilution of [a] plaintiff's trade secrets constitutes irreparable injury justifying injunctive relief."); Unisource Worldwide, Inc. v. S. Cent. Alabama Supply, LLC, 199 F. Supp. 2d 1194, 1212 (M.D. Ala. 2001) (finding that harm to employer from former employee's alleged disclosure of trade secrets was irreparable); see also Leo Publications, Inc. v. Reid, 265 Ga. 561, 562 (1995) (affirming trial court's order directing defendant to return former employer's customer list). The threat of irreparable injury which Diamond Power faces as a consequence of Defendant's misappropriation of its trade secrets is clear. In light of the showing that Defendant possesses Diamond Power's trade secrets, the threat of disclosure, and more particularly use, of this information is significant. If Diamond Power's confidential and trade secret information is actually used by Defendant in targeting customers, the injury suffered would be permanent.

For example, were Defendant to review Diamond Power's PowerTrain spreadsheet, it would know which customers were purchasing upgrades, the types of equipment being purchased, and the price; with this information the competitor could unfairly compete against Diamond Power to divert forthcoming business from customers who are in need of upgrade services. Likewise with respect to Invoiced Order Summaries, Defendant would be able to implement marketing strategies centered

- 21 -

on the spending patterns of Diamond Power's customers.

D.    The Balance of Hardships Supports Entry of Injunctive Relief.

Defendant will suffer no injury if the injunctive relief Diamond Power seeks is issued. The only impact that the injunctive relief sought by Diamond Power would have on Defendant is to force them to give up access to Diamond Power's confidential and trade secret information and to allow Diamond Power to confirm (by examining Defendant's system and back-up tape) that Defendant has not retained any copies or other derivatives of this information. In contrast, Diamond Power has expended significant resources in the design and development of its trade secrets and has gone to great lengths to ensure that they remain secret and will incur immeasurable harm if its trade secrets are disclosed to anyone. The hardship that Diamond Power will suffer without injunctive relief in light of these efforts is clear.

E.    Temporary Injunctive Relief Will Not Disserve the Public Interest.

The public interest is best served by requiring persons to compete fairly rather than by using unlawful means to divert a competitor's employees and business. See Specialty Chems. & Servs., Inc., 1998 WL 618583, at *6 ("Certainly, there is a cognizable public interest in discouraging employees from succumbing to the temptation of easy profit by breaching their employer's trust and misappropriating proprietary information for their own gain."). Accordingly, public interest would be

- 23 -

served by ordering Defendant to return Diamond Power's information to Diamond

Power and to enjoin Defendant from using such information for its own benefit.

### III.   CONCLUSION

Accordingly, for all of the reasons set forth above and in Diamond Power's

Complaint, Diamond Power respectfully requests that the Court grant its Motion for a

Temporary Restraining Order or interlocutory injunction.  A proposed order granting

the relief sought is attached hereto for the Court's convenience.[7]

Respectfully submitted this ___14th___ day of June, 2004.

ALSTON & BIRD, LLP

By: _____
Warren R. Hall, Jr.
Georgia Bar No. 319405
Allison J. Viscardi
Georgia Bar No. 728059
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
(404) 881-7777

ATTORNEYS FOR PLAINTIFF
DIAMOND POWER INTERNATIONAL,
INC.

---

[7]     By their signature below, counsel certifies that this brief has been prepared in
Times New Roman 14-point font, one of the font and point selections approved by this
Court in Local Rule 5.1B, N.D. Ga.

- 24 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION |
| CLYDE BERGEMANN, INC, | ) ) | FILE NO. _____ |
| Defendant. | ) ) ) | |

## TEMPORARY RESTRAINING ORDER

Before the Court is Plaintiff's Motion for Temporary Restraining Order and

Preliminary Injunction and Incorporated Memorandum of Law in Support Thereof

filed by Plaintiff Diamond Power International, Inc. ("Diamond Power"). A

hearing was held, and the parties were heard. The Court finds that Diamond Power

is likely to prevail on its claims that Defendant Clyde Bergemann ("Defendant")

misappropriated trade secrets from Diamond Power and that there exists a

substantial threat of irreparable harm against Diamond Power if injunctive relief is

not granted. Accordingly and for good cause shown, the Court orders as follows:

1. Defendant is hereby and immediately enjoined from using or disclosing

   in any way any information contained in documents or computer files

- 26 -

originating from Diamond Power's computer system including, without

limitation, the following documents:

   a.  Cost.data.xls report;

   b.  Diamond Power's PowerTrain purchaser spreadsheet;

   c.  Diamond Power's "Parts Comparison Doc";

   d.  The Diamond Power Hardware Book; and

   e.  Invoiced order summaries.

2.  Defendant is hereby and immediately enjoined from altering, erasing,

    deleting, destroying any computer, computer drive, computer disk,

    backup tape, or other information containing medium currently in its

    possession, custody or control, or in any way spoliating evidence

    pertaining to the allegations in Diamond Power's Complaint; and

3.  Defendant shall permit, within 3 business days of receipt of the Court's

    order, a computer examiner, not employed with Diamond Power, to

    access and make two (2) digital images of Defendant's computer servers

    hosting Defendant's "user directories" (the "BDC" server), Defendants

    sales share (the "PDC" server), and Defendant's e-mail system (the

    "CBA01" server).  For each server identified above, Defendant shall also

    make available for digital imaging as set forth above, each and every

- 27 -

"backup tape" maintained by Defendant for all periods of time from September 1, 2003, through the present. One of the digital images made pursuant to this Order shall be filed with the Court as evidence; the remaining image shall be delivered to counsel for Diamond Power for examination, provided that counsel for Diamond Power shall not reveal the contents of the images to any employee of Diamond Power unless it is pursuant to an order of the Court or pursuant to express written permission by counsel for Defendant. If Defendant desires a set of digital images identical to those prepared as ordered, one shall be provided by the computer examiner if Defendant pays for its copy of the images and pays a one-third (1/3) share of the total expense of the imaging process.

4. The parties shall engage in expedited discovery on the following schedule: commencing as of the date of this Order (a) responses to up to ten (10) written interrogatories shall be served within ten (10) days after service by facsimile of the requests; (b) responses to up to five (5) requests for the production of documents shall be served within ten (10) days after service by facsimile of the requests.

So ordered this _____ day of June, 2004.


_____
United States District Judge
Northern District of Georgia

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| CLYDE BERGEMANN, INC. | ) | FILE NO. _____ |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **DECLARATION OF C. G. KOKSAL**

1.

My name is C.G. ("Jeff") Koksal and I am of legal age and competent to give this sworn testimony. The facts stated herein are known by me to be true based on my personal knowledge.

2.

I am currently employed with Diamond Power International, Inc. as General Manager of Sales and Service. I have held this position since April 1996.

3.

Diamond Power is in the business of providing boiler cleaning systems and products primarily to the pulp and paper, chemical, and electric utility industries. The cleaning systems, called "sootblowers," and their related systems are designed to keep industrial boilers operating at peak efficiency.

# EXHIBIT A

4.

From June 2002 until his separation from employment effective October 31, 2003, I was the direct supervisor of Wayne Davidson.  Soon after Mr. Davidson began reporting to me, he was named to the position of Manager of U.S. Service Center Operations for Diamond Power.  Mr. Davidson held this position until his separation from employment with the company.  In this position, Mr. Davidson was responsible for supervising Diamond Power's three service centers located in metropolitan Atlanta, Chicago, and Seattle.

5.

Diamond Power's regional service centers provide maintenance and rebuilding services for sootblowers and related equipment.  As Manager of U.S. Service Center Operations, Mr. Davidson was a point of centralized control over all three service centers facilities in the United States and reported directly to me.  In this capacity, Mr. Davidson was responsible for operational performance and expense control for each of the service centers, managing inventory levels at the service centers, and assisting in the sales process to provide customers of Diamond Power with analysis and recommendations evaluating alternatives to new equipment purchases including evaluating rebuilding and maintenance programs offered by Diamond Power through its service centers.

6.

On or about September 30, 2003, I received notice from Mr. Davidson of his
intent to "retire" from his employment with Diamond Power effective October 31, 2003.

7.

Diamond Power possesses many types of trade secrets or proprietary information
that were available to Mr. Davidson given his position at Diamond Power. Below, I
discuss several examples of such information.

8.

PowerTrain.

PowerTrain is the name of a new product offering from Diamond Power
introduced into the market place only in late 2002. Diamond Power's new PowerTrain
carriage system is essentially a gearbox transmission for moving sootblower equipment
inside of an industrial boiler. Such systems previously built by Diamond Power and
other manufacturers require periodic maintenance and have occasionally leaked
lubrication fluid. Diamond Power's new PowerTrain carriages are designed for
maintenance free operation without added lubricant and represent the latest technology
available in the industry.

9.

The identity of actual purchasers of PowerTrain carriages from Diamond Power is
information which is not available outside of Diamond Power and is not known or readily
ascertainable by others in the industry, including Diamond Power's competitors such as
Clyde Bergemann, Inc. ("Bergemann"). The identity of PowerTrain purchasers would be

very valuable to a competitor of Diamond Power because the competitor could use the information to target sales and marketing efforts directly to Diamond Power customers that have already purchased the PowerTrain carriage. A list of PowerTrain carriage purchasers also identifies who in the industry is buying and upgrading their sootblower equipment and would allow a competitor to focus their efforts on making sales to such customers. Based on my experience in the industry and my knowledge of the customers identified on the spreadsheet, each PowerTrain purchaser operates as few as 30 to as many as 80 or more sootblowers which could eventually be rebuilt with PowerTrain carriages in the coming months and years. Thus, a list of PowerTrain purchasers would represent only the "tip of the iceberg" of the sales Diamond Power would anticipate having in the coming years.

10.

A list identifying purchasers of PowerTrain carriages also would allow a competitor to target negative advertising information directly to PowerTrain purchasers. The ability to make such targeted marketing and sales efforts is highly efficient and can give the possessor of such information a competitive advantage over Diamond Power. Moreover, the identity of the purchasers of the PowerTrain carriage also would provide to a competitor information regarding the market penetration of the new PowerTrain product and the degree of success with which the new product is being received in the market. Lastly, of course, a PowerTrain purchaser list also would allow a competitor to easily identify customers and perspective customers who have not already purchased the PowerTrain equipment and thus would allow a competitor to engage in focused and targeted sales and marketing activities.

- 4 -

11.

PowerTrain purchasers are identified in a PowerTrain spreadsheet which is confidential to Diamond Power and is subject to strict efforts to maintain its secrecy. The document was originally prepared and maintained by Mr. Davidson for distribution to only approximately sixteen (16) top sales and service managers at Diamond Power. The document is protected from unauthorized access by Diamond Power's security measures detailed in the declaration of Lou Stang, submitted to the court in the matter of Diamond Power International, Inc. v. Wayne Davidson. The PowerTrain purchaser information is not available from any source other than Diamond Power and is not known or available to the public in general or, specifically, to competitors of Diamond Power.

12.

Parts Comparison Document

I created a document called "Parts Comparison" which evidences Diamond Power's strategic and marketing approach towards the sale of certain products and in particular with respect to a competitor such as Bergemann. The document contains information revealing Diamond Power's internal analysis of the relative performance and life cycle of the products identified. This information regarding the average life expectancy of certain Diamond Power parts is extremely confidential and would not be available to any person outside of Diamond Power. The document also identifies several key sootblower parts and discusses the manner in which Diamond Power sales representatives should attempt to market and sell the part in competition with parts produced by competitors such as Bergemann. The document contains precise

information about Diamond Power's pricing for the identified parts which is not readily ascertainable by competitors of Diamond Power.

13.

The information contained in this Parts Comparison document is so confidential that I drafted it and maintained it only on my own laptop computer and distributed it only to a small and select group of individuals within Diamond Power based on a need to know as determined by me personally. The group of individuals at Diamond Power to whom I distributed this document was less than ten (10). Wayne Davidson received a copy of this document from me based on his request that I send it to him.

14.

The information contained in the Parts Comparison document pertaining to the average lifespan of the Diamond Power parts and Diamond Power's strategic plan for marketing and selling the products is very confidential to Diamond Power and not known to the public or to competitors of Diamond Power. If a competitor of Diamond Power came into possession of this information, it would provide economic benefit to the competitor who would have confidential information about Diamond Power products and have insights into Diamond Power's strategic marketing plan for competing against the competitor. This information would allow the competitor to prepare and implement a specific plan to counter the marketing plan implemented by Diamond Power.

15.

Diamond Power Hardware Book

The Diamond Power Hardware Book is a single source for the specifications and precise details of parts and raw materials that Diamond Power purchases or has

- 6 -

purchased for its sootblower equipment. For every component of a Diamond Power piece of equipment, there is a specific part number assigned. The Hardware Book identifies precise details and specifications by part number for each part or raw material item used by Diamond Power. The Diamond Power Hardware Book is maintained confidential within Diamond Power and is not disclosed to anyone outside of the company. If obtained by a competitor of Diamond Power, the Hardware Book would be extremely valuable because of the nature of the sootblower industry. Competitors of Diamond Power, such as Bergemann, compete against Diamond Power in the repair and rebuilding of existing sootblower equipment. Thus, competitors such as Bergemann routinely bid to replace parts and repair Diamond Power equipment in use by a customer. By use of the Hardware Book, a competitor would know precise specifications for purchased materials or components incorporated into Diamond Power sootblower equipment and could purchase or manufacture such pieces based on Diamond Power's own specifications.

16.

Invoiced Order Summary reports

Diamond Power utilizes an Oracle database system for its financial record keeping. One of the types of reports which can be generated by the Oracle system is called an "Invoiced Order Summary" reports. Invoiced Order Summary reports identify virtually all domestic U.S. customers of Diamond Power and the total amount of each customer's purchases for the period of time covered by the report. Invoiced Order Summary reports can also be generated to contain information about subgroups of Diamond Power's business such as parts sales, rebuild sales, or field service sales.

17.

An Invoiced Order Summary designated as "dp1" would identify virtually every domestic U.S. customer of Diamond Power who had purchased products or services from Diamond Power and also would identify the precise dollar amount of the purchases for each purchaser.  Other Invoiced Order Summary reports are designated as "field services," "parts," and "rebuild."  These reports would identify virtually every domestic U.S. customer of Diamond Power who had purchased, respectively, field services, equipment parts, or rebuild services from Diamond Power and also would identify the precise dollar amount of the purchases.  With these three latter reports and the "dp1" report, it is possible also to quantify Diamond Power's domestic U.S. new equipment sales.  Thus, a possessor of these Invoiced Order Summary reports could quantify and qualify Diamond Power's domestic sales and customer lists overall, and in virtually every distinct facet of Diamond Power's business.

18.

I am aware that Diamond Power computer records reflect that during October 2003 Wayne Davidson accessed from Diamond Power's Oracle database system each of the above-described Invoiced Order Summary reports covering the time period of October 1, 2002, through September 30, 2003, -- the last full 12 month period in which Mr. Davidson was employed with Diamond Power.

19.

The information contained in the Invoiced Order Summary reports is not available to any person outside of Diamond Power and is maintained confidential by Diamond Power employees.  Indeed, as discussed more fully in the Declaration of Lou Stang, the

Oracle database system is protected by additional layers of security beyond the security measures in place for Diamond Power's primary, internal computer network. The information contained in the Invoiced Order Summary reports is not available and could not be ascertained by persons outside of Diamond Power. The information contained in the Invoice Order Summary reports would be very valuable to a competitor of Diamond Power because the reports identify all Diamond Power customers and precise dollar amounts of their purchases of Diamond Power goods and services. With this information, a competitor would know which customers are purchasing the greatest amounts of Diamond Power goods and services and could thus focus their marketing and sales efforts on purchasers who are active consumers. Alternatively, a competitor could also determine which customers Diamond Power has relatively minor relationships with and could attempt to take advantage of that knowledge as well.

20.

A cost.data.xls report can be generated from Diamond Power's Oracle system in a spreadsheet format which identifies hundreds of Diamond Power equipment parts and, for each individual part, identifies the total cost to Diamond Power for producing that part. The report also breaks down the cost for each part by raw materials, labor cost, and overhead cost. This detailed cost information is kept confidential within Diamond Power and is not available to anyone outside of the company. This cost information is not susceptible to being determined or calculated by anyone outside of Diamond Power. The information would be very valuable to a competitor of Diamond Power as it could be used to competitively price equipment at levels where Diamond Power could not compete. It also would give a competitor knowledge of which pieces of equipment it can

produce more cheaply, or more expensively, than Diamond Power and thus alter its marketing, sales, or pricing practices accordingly.

21.

In summary, Diamond Power considers the documents and information which I have referenced herein to be extremely sensitive, confidential, and proprietary trade secrets. The information includes sales, costs, and customer contact and purchase information which is available in aggregate from no source other than Diamond Power. The information is not disclosed or made available to anyone not employed by Diamond Power or its parent. A competitor of Diamond Power could obtain a distinct and unfair advantage in the marketplace if the information described herein were made available to it. The impact of a competitor learning this confidential information, using this information to market and sell its products, and sharing this information with mutual customers would result in permanent, long-term, and irreparable economic damage to Diamond Power's business.

22.

I am aware through numerous sources of information that Mr. Davidson is currently employed with Clyde Bergemann, Inc. Mr. Davidson was seen representing Clyde Bergemann at a trade show and Mr. Davidson has contacted several employees of Diamond Power and confirmed that he is employed with Clyde Bergemann. I am aware that Clyde Bergemann operates a facility in the Atlanta, Georgia, metropolitan area. Clyde Bergemann is a major competitor of Diamond Power; the two companies are involved in virtually the same lines of business and regularly compete for business opportunities in the sootblower business.

23.

If Mr. Davidson were to disclose the information in the documents discussed above to his current employer, or if he used the information contained in said documents on behalf of his current employer, Diamond Power would be severely and irreparably harmed. With the information described above, Mr. Davidson and/or his current employer could unfairly compete against Diamond Power for customers and business opportunities in the boiler cleaning industry. Mr. Davidson and/or his current employer could use the information to divert actual and prospective purchase orders or unfairly influence the competitive balance and thus drive Diamond Power's price levels, and margins, down. Further, Mr. Davidson and/or his current employer could use the information to disrupt and permanently damage Diamond Power's actual and prospective customer relationships. It would be impossible to value the full extent of the damage which is threatened by Mr. Davidson's or his current employer's use of the information contained in the documents misappropriated as set forth above.

24.

As a senior level manager of Diamond Power, I am aware that company policy requires all employees to execute a confidential information agreement under which they pledge to maintain the confidentiality of Diamond Power's business information, to return same to Diamond Power upon separation from employment, and to not use such information for purposes other than for Diamond Power's business. Mr. Davidson signed such an agreement.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June _____, 2004.

C. G. Koksal

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| WAYNE DAVIDSON, | ) | FILE NO. _____ |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF LOU STANG

1.

My name is Lou Stang and I am of legal age and am competent to provide this sworn testimony. I am employed as Manager of Information Technology with Diamond Power International, Inc. I have held this position since 1994 and have been an employee of Diamond Power since 1994.

2.

As Diamond Power's Manager of Information Technology, I am responsible for overseeing aspects of Diamond Power's information technology systems, including the company's internal computer network, and specifically the company's database system called Oracle, as well as the systems, processes, and hardware used by Diamond Power employees to access company computer and information systems.

# EXHIBIT B

3.

I am responsible for providing computers and appropriate software to Diamond Power employees so that they may access Diamond Power's internal computer system from within and outside of company offices.

4.

I was responsible for providing to Wayne Davidson a laptop computer purchased and owned by Diamond Power for his use as an employee of Diamond Power. The laptop computer provided to Mr. Davidson by Diamond Power ("the Davidson laptop") allowed Mr. Davidson to access Diamond Power's internal computer network, including the Oracle system, both from within Diamond Power's offices and remotely.

5.

Diamond Power's internal computer network (the "network") is made available to most, but not all, Diamond Power employees. Access is limited to employees who are provided a login and password which permits entry into the network. Such employees are authorized "users" of the network. Each network user is assigned a profile which permits the particular user to access certain applications and drives on the network. All network users are not given access to all areas of the network.

6.

Within Diamond Power's network, the Oracle database system is available to only a limited group of network users. Access to the Oracle system is protected by a user name and password assigned by the information technology department ("IT department"). Only Diamond Power network users with a need to access the Oracle

system are given a user name and password to allow access to the Oracle database. Access to the Oracle system is further limited in that employees are only permitted to access certain portions of the Oracle system to which it has been determined that they need access.

7.

Out of approximately 500 total employees at Diamond Power, less than ¼ are network users. Thirty-four percent (34%) of Diamond Power employees have no access to any portion of the Oracle system. Outside of the accounting department and three (3) employees in the IT department, only eighteen (18) employees of Diamond Power had access to the financial records in Oracle which were misappropriated by Mr. Davidson as recounted below.

8.

In addition to the login and password systems for the protection of access to Diamond Power's computer network and second layer of password and user name protection for access to the Oracle database system, the entire Diamond Power computer network is firewall protected to prevent unauthorized access by unauthorized persons. As an additional level of security, physical access to Diamond Power's operational headquarters in Lancaster, Ohio, where its computer systems are housed, is limited by regulations requiring all employees to wear and display identification badges while in the office. Vistors must identify themselves, sign in, and be accompanied while in the offices. After hours, access to Diamond Power's Lancaster office is controlled by security guards who permit access only upon showing a valid company identification badge.

- 3 -

9.

Diamond Power's network and Oracle database system contains confidential and proprietary information regarding the company's financial data and performance, sales records, and customer identification and contact information. As described above, access to information from the network and the Oracle database is protected by several layers of security protection so that only authorized employees of Diamond Power or its parent have access to data, and only on a need to know basis.

10.

Wayne Davidson was a network user and also a user granted access to the Oracle database system. As the Manager of U.S. Service Center Operations, Wayne Davidson was granted access to all parts of the computer network, including the Oracle system, which were deemed necessary for managers in the sales and service functions at Diamond Power.

11.

Upon his separation from employment with Diamond Power in late October 2003, Mr. Davidson returned to the company the Davidson laptop to me. It is the IT Department's normal practice to examine the status of a laptop computer turned in by a departing employee and we followed this practice with respect to the Davidson laptop. Upon examination, the IT department discovered that significant portions of the email system (e.g. the entire email in-box file and sent items file) and all Word (text) and Excel (spreadsheet) documents from the Davidson laptop had been deleted, erased, or overwritten prior to the return of the computer to Diamond Power. It is very unusual for

an employee separating employment with Diamond Power to delete such data and files from his or her company-owned laptop computer.

12.

Diamond Power commissioned a forensic computer examination of the Davidson laptop after his return of it upon his separation from employment with Diamond Power. I have reviewed the computer files and data retrieved by the forensic computer examination performed by K&F Consulting in Atlanta, Georgia. The data retrieved from the Davidson laptop reveals that Mr. Davidson accessed data, records, and documents stored on the Diamond Power network, the Oracle system, or the Davidson laptop and copied or somehow transferred files to an external "zip" drive attached to, but external from, the Davidson laptop. An external zip drive is a means of storing data or information outside of the computer hard drive itself. Diamond Power did not provide an external zip drive to Mr. Davidson for his use as an employee of Diamond Power, so the zip drive must have been acquired by Mr. Davidson from some source other than Diamond Power. Mr. Davidson did not turn in an external zip drive to Diamond Power as part of his computer equipment when he turned in the Davidson laptop.

13.

By copying files and documents to his external zip drive, Mr. Davidson would retain access to the information after returning the Davidson laptop to Diamond Power and after Mr. Davidson could no longer access Diamond Power's computer network or Oracle system. In short, by copying information to his zip drive, Mr. Davidson could retain access to and use of the information after his separation from employment. Among

the files, records and data accessed and copied to his zip drive by Mr. Davidson are the
following:

| File name | Description (date of last access on zip drive) |
|---|---|
| Dpii.balance.txt<br><br>DPII.income1.txt | Diamond Power 2003 year-to-date balance sheet and income statement (10/14/03). |
| Powertrain.xls | List of all sales of new Powertrain Carriages identifying customers, customer locations, quantity, description of order, and sales price (10/13/03). |
| Ikschd.xls | Diamond Power's IK sootblower production schedule identifying every sootblower produced since March 1998 by customer, date and cost; also includes prospective production schedules for all placed orders (10/9/03). |
| Cost Markup Multipliers.doc | List of Diamond Power multiplier formulae for setting prices of non-standard priced equipment (10/8/03). |
| DPSC [customer A].xls | Diamond Power's parts price list for customer A (10/8/03). |
| [customer B].xls | Diamond Power's parts price list for customer B facility (10/8/03). |
| [customer C] 8.03.xls | Diamond Power's parts price list for customer C (10/8/03). |

I declare under penalty of perjury that the foregoing is true and correct.  Executed
on January 12, 2004.

Lou Stang

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER                  )
INTERNATIONAL, INC.,           )
                               )
        Plaintiff,             )
                               )      CIVIL ACTION
v.                             )      FILE NO. _____
                               )
CLYDE BERGEMANN, INC.,         )
                               )
_____Defendant._____    )

## DECLARATION OF GREGORY L. FORDHAM

1.

My name is Gregory L. Fordham and I am of legal age and competent to give this sworn testimony. The facts stated herein and are known by me to be true based upon my personal knowledge.

2.

I am a principal with K&F Consulting, Inc. which is a computer consulting firm located in Atlanta, Georgia. A true and correct copy of my current curriculum vitae is attached hereto as Exhibit A. I have been professionally performing forensic computer analysis services since January 2001.

3.

Pursuant to the Order Granting Injunctive Relief dated January 14, 2004, in the case of Diamond Power International, Inc. v. Wayne Davidson, Case Number 1:04-cv-0091-RWS, in the United States District Court for the Northern District of Georgia, Atlanta Division, K&F Consulting obtained and examined computer equipment in the possession,


EXHIBIT C

custody, or control of Wayne Davidson.  Included in this computer equipment was an IBM ThinkPad Notebook Computer ("ThinkPad Notebook Computer").  Mr. Davidson represented to K&F Consulting that the ThinkPad Notebook Computer was his work computer provided to him by his employer, Clyde Bergemann, Inc.

4.

K&F Consulting created three (3) digital images of the complete hard drive of the ThinkPad Notebook Computer.  The digital image of the ThinkPad Notebook Computer was created on January 20, 2004, at the home of Mr. Davidson.  A subsequent image of the same computer was obtained on January 28, 2004.

5.

Pursuant to the Consent Restraining Order entered by the Court on January 23, 2004, K&F Consulting deposited three digital images of the ThinkPad Notebook Computer into the registry of the Court.  Also pursuant to the Court's Consent Restraining Order, one of the digital images of the ThinkPad Notebook was released to counsel for Diamond Power for forensic examination.   K&F Consulting conducted a forensic examination of the digital image of the ThinkPad Notebook Computer.

6.

K&F Consulting's review of the ThinkPad Notebook Computer included an examination of existing files as well as deleted, erased, or overwritten computer files which were retrieved.

7.

K&F Consulting's examination of the ThinkPad Notebook Computer (January 20th image) retrieved the e-mail communications attached hereto as Exhibit B, C, and D.

8.

The examination of the ThinkPad Notebook Computer (January 20th image) also revealed the existence of numerous "link files" which reflect the existence of certain documents identified by the information contained within the "link file." "Link files" are created when a computer, such as the ThinkPad Notebook Computer accesses another computer, such as a company's internal computer network server, to perform a function such as opening and reviewing a document. Link files show that a connection was made between the computer and a file existing on another computer or system. Link files thus prove the existence of a document at a particular location at a particular point in time. The link file gives the name and computer "address" of the file accessed by the computer on which the link file exist. "Link files" retrieved from the ThinkPad Notebook Computer which reflect connections between the ThinkPad Notebook Computer and computer servers or systems designated "nt_bdc" and "nt_pdc" are identified on the list attached hereto as Exhibit E.

9.

"Link files" evidence the existence of a computer file (e.g. a document or worksheet) at the location identified in the "link." For example, I retrieved the following link file information from the ThinkPad Notebook Computer. The information is displayed below as seen in the preview mode using my forensic computer analysis software.

| A0010765.lnk | l s     o             B   &       #     \\nt_bdc\users U: Wayne Davidson\DP Rebuild Info\Cost.data.xls ! U : |
|---|---|

This link file reveals that a document entitled "cost.data.xls" existed on the computer server designated "nt_bdc," folder "Users," sub-folder"Wayne Davidson," and in a sub-sub-folder

- 3 -

designated "DP Rebuild Info" at least as of the date the "link" was created which for this link file was December 22, 2003.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 14, 2004.

Gregory L. Fordham

- 4 -



# CURRICULUM VITAE
## OF
### GREGORY L. FORDHAM, CPA, CIA

Principal, K&F Consulting, Inc.
1303 Hightower Trail, Suite 315
Atlanta, GA 30350
770-642-0311 (voice)
770-642-9913 (fax)
greg@knfcon.com (e-mail)

| | |
|---|---|
| <u>Education</u> | • Bachelor of Business Administration (BBA), concentration in accounting, Emory University (1981)<br>• Associate of Arts (AA), Oxford College of Emory University (1979) |
| Professional <u>Certifications</u> | • Certified Public Accountant (CPA), Commonwealth of Virginia<br>• Certified Internal Auditor (CIA) |

## WORK HISTORY

**Jun 1991 - Present**

**Principal, K&F Consulting, Inc.,** Atlanta Georgia. - Since its founding in 1991 K&F has provided numerous services to contractors and attorneys including claims and terminations, cost structures, disclosure statements, policies and procedures, compliance matters and proposal preparation. Often these projects involved acquisition, analysis and production of electronic data to prove entitlement, causation or quantum. Prior to 2001 K&F's services were provided exclusively in the field of government contracts. Since 2001, however, Mr. Fordham's expertise in computerized systems has expanded the application of his skills to many areas outside the field of government contracts ranging from large, complex construction litigation to smaller family law matters, as well as, employment law, bankruptcy and anti-trust litigation.

**Apr 1988 - May 1991**

**Consultant, T. A. Carlson & Company,** Springfield, VA. - Provided consulting services to Fortune 500 companies in the field of government contracts. Services typically involved claims and terminations, cost structures, disclosure statements, policies and procedures, compliance matters and proposal preparation.

**Apr 1987 - Apr 1988**

**Consultant, Seidman & Seidman,** (now BDO/Seidman) Washington D.C. - Provided consulting services to contractors and attorneys in the field of government contracts. Services typically involved claims and contract terminations.

**Aug 1984 - Apr 1987**

**Staff Auditor, Central Intelligence Agency,** Washington, D.C. - Served almost 2 years in the Office of Inspector General performing operational audits of agency activities. Served 1 year in the Office Finance performing pre and post award audits of agency contractors.



EXHIBIT A

CURRICULUM VITAE OF GREGORY L. FORDHAM

| | |
|---|---|
| Oct 1983 - Aug 1984 | **Staff Accountant, Brooks & Brooks**, Certified Public Accountants, Atlanta, GA - Prepared tax returns and compilation reports for various businesses, as well as, other financial and computer consulting services. |
| Feb 1983 - Sep 1983 | **Staff Accountant, Owens & Stern**, Certified Public Accountants, Atlanta, GA - Prepared tax returns and compilation reports for various businesses, as well as, other financial and computer consulting services. |
| Apr 1982 - Feb 1983 | **Owner, Construction Consultants International**, Atlanta, Ga - Performed accounting and tax services for various businesses |
| Jul 1981 - Mar 1982 | **Controller, Palace Industries**, Atlanta, GA - Palace Industries was a home improvement contractor working in 6 southeastern states. As controller I was responsible for all accounting and financial operations such as preparation of monthly financial statements, job cost reports, weekly payrolls, etc. |
| Jun 1980 - Aug 1980 | **MidWestern Distributions**, Ft Scott, KS - Summer job as over-the-road tractor trailer driver covering lower forty-eight states |
| Pre 1980 | Summer jobs in family owned construction business. Experiences included structural and ornamental steel fabrication and erection, precast concrete panel manufacture, operation of heavy equipment, pile driving superintendent, project management and claim settlement. |

## PROGRAMMING LANGUAGES

| | |
|---|---|
| Current Computer Languages | Borland Delphi, SQL |
| Prior Computer Languages | Borland ObjectPal, dBase, Rbase, Borland Quattro, Lotus 1-2-3, Nomad, Ramis, GEMS, REXX, Fortran, Cobol, Basic, Z-80 Assembler |

## WRITINGS

| | |
|---|---|
| Published Articles | *The Case Against Offsets When Pricing Changes and Delay Claims in Federal Government Contracts*, The Procurement Lawyer, American Bar Association Section of Public Contract Law, Vol 39, No 3, Spring 2004<br><br>*Electronic Format Superior for E-Mail Production*, Digital Discovery & e-Evidence, Vol.3 No. 11, November 2003, Pike & Fischer, Inc., a subsidiary of The Bureau of National Affairs, Inc.<br><br>*Commercial Items: A New Frontier*, Government Contracts Service, May 30, 1996, Number 10-96, Procurement Associates<br><br>*FAS 121 and the Interim FAR Rule: Sound Strategies for Avoiding or Minimizing an Impairment Loss*, Federal Contracts Report, April 29, 1996, Vol. 65, No. 17, Bureau of National Affairs |

CURRICULUM VITAE OF GREGORY L. FORDHAM

*Wickham Contracting: A Holocaust*, The Clause, December 1995, The Board of Contract Appeals Bar Association

*The New World Order*, Contract Management, January 1993, The National Contract Management Association

*Determining Defense Contract Unallowable Costs Under CRAG*, Internal Auditing, Winter 1990, Vol. 5, No. 3, Warren, Gorham & Lamont.

*Auditing Unallowable Costs of Federal Government Contractors*, Internal Auditing, Summer 1989, Vol. 5, No. 1, Warren, Gorham & Lamont.

*MRP and the DoD Solution*, Contract Management, October 1988, The National Contract Management Association.

*Computerized Job Cost Considerations for Government Contractors*, Contract Management, March 1988, The National Contract Management Association.

*The Gleam and Glitter of Cost Reimbursable Contracting*, The Certificate, January 1988, The District of Columbia Institute of Certified Public Accountants.

**Articles not Published**

*Electronic Data Discovery Unleashed*, http://www.knfcon.com/LIBRARY/PRIMERS/EDDU.pdf, (2001, 2002)

*How to Get Rich with Electronic Data Discovery*, www.knfcon.com/LIBRARY/PRIMERS/GetRich.pdf (2002)

*Contract Changes and Claims*, http://www.knfcon.com/LIBRARY/PRIMERS/claims.htm (1994)

*Terminations For Convenience*, http://www.knfcon.com/LIBRARY/PRIMERS/t4c.htm (1993)

*Cost Accounting Standards*, http://www.knfcon.com/LIBRARY/PRIMERS/cas.htm (1992)

*Employee Drug Testing under FAR Section 223.7500*, http/www.knfcon.com/LIBRARY/PRIMERS/KFDrugTesting.pdf (1989)

## SPEAKING

American Bar Association Construction Forum, Annual Meeting, May 2003

Electronic Data Discovery

Montgomery County Maryland Bar Association, Annual Meeting, May 2003

Electronic Data Discovery

American Bar Association Transportation MegaConference, April 2003

Electronic Data Discovery

Law Seminars International, IT Litigation, December 2002

Electronic Data Discovery

National Employment Lawyers Association, June 2002

Electronic Data Discovery

Construction Industry Section, Atlanta Bar Association, March 2002

Electronic Data Discovery

National Contract Management Association

Frequent speaker to Association Chapters on items of topical interest such as Contract Changes and Claims, Terminations for Convenience, Cost Accounting Standards, Truth-in-Negotiations Act, Material Requirements Planning, Cost Allocation and Recovery, Subcontracting Rules, Commercial Item Acquisition

CURRICULUM VITAE OF GREGORY L. FORDHAM

National Association of Purchasing Managers
>    Material Requirements Planning

Federal Bar Association
>    Cost Allocation and Recovery, Contract Delays

Society of Cost Estimating and Analysis, April 1992
>    Cost Allocation and Recovery

University of Maryland
>    Cost Allocation and Recovery

## TEACHING

National Education Seminar (NES)
> From 1996 to 2001 served on the faculty for the National Education Seminar sponsored by the National Contract Management Association.  Subjects presented included; Program and Contract Changes, Commercial Item Acquisition, FAR 15 Rewrite, Contracts Professional as a Business Manager, Award Term Contracting.

## MEMBERSHIPS

National Contract Management Association
> Member since 1987 and have served in various leadership capacities including Programs Manager, Treasurer, NES Faculty member and frequent speaker.

Public Contract Law Section, American Bar Association
>    Associate member since 1990

Litigation Section, American Bar Association
>    Associate member since 2001

Construction Forum, American Bar Association
>    Associate member since 2001

Atlanta Bar Association
>    Affiliate member since 2001

## TESTIFYING EXPERIENCE

| | |
|---|---|
| 2004 | Atlantix Global Systems, LLC. v Jacky Zhu and Canvass Systems, LLC., Case 03-A-06191-1, Superior Court of Gwinnett County, GA |
| 2003 | Bright Metal Specialties, Inc. v Employers Insurance of Wausau and Rogers Construction Company, Case 32-110-00044-97, American Arbitration Association, Miami FL |

## OTHER ACCOMPLISHMENTS

> Eagle Scout, combination palms bronze over silver

EMO161U.txt
Source folder: Notes Folders\All documents

=== Email ====================================================

Sent Date: 12/16/2003 01:23:00p
Received Date: 12/16/2003 01:23:00p
From: Wayne Davidson <>
TO: ZCBA Reps US All <>
CC: ZCBA Field Service Group <>
    Dana D. Steine <>
    James Pepper <>
    Joey Payne <>
Subject: Possible Rebuild Opportunities

The attached spreadsheet lists those rebuild customers with Diamond Power
equipment that have expressed some dissatisfaction with Diamond's pricing or
had some other problem such as poor on time delivery. These customers may be
ready to switch rebuild venders.

Let me know if there is some way I can assist you in convincing these or any
other customer to switch to Clyde Bergemann for rebuild service.


Wayne Davidson
Manager, Rebuild Activities
Clyde Bergemann Inc
Phone 770-557-3629
Fax 770-557-3729
email wayne@clydebergemann.com

=== End of Email =============================================

=== Attachments ==============================================
   Rebuild Opportunities.xls
=== End of Attachments =======================================

CONFIDENTIAL

D - 0018



EXHIBIT B

| Customer | City & State | Rationale | Comments |
|---|---|---|---|
| AEP Plants | Ohio | Price | |
| AEP/SWEPCO Welsh Sta | Pittsburg, TX | Price & on time performance | |
| Alabama Pine/River Pulp | AL | Price | |
| Alabama Power Miller | Quenton, AL | Price | |
| American Refuel | Westbury, NY | Price | |
| Boise Cascade | St Helens, WA | Price | |
| Boise Cascade | Wallula | Price | |
| Bosie Cascade | International Falls, MN | Price | |
| Bowater | Catawba, SC | Price | |
| BP Products | Toledo, OH | Price | |
| City of Sikeston | Sikeston, MO | Price | |
| Colorado Springs Utilities, Martin Drake Plant | CO. | Price | |
| DELMARVA | All utility plants in DELMARVA area | Price | Diamond sales very weak in this area |
| Detroit Edison | All Plants | Price plus not happy with Diamond on-time performanace | |
| Domtar | Ashdown AR | Price. | Plant has a strong union, so must be able to convince maintenace personnel that the rebuild includes an upgrade that can not or should not be done in house. |
| Eastman Kodak | Rochester, NY | Price, on time delivery | |
| Entergy | Greenville, MS | Price | |
| Exxon | Joliet, IL | Price | |
| FMC Corp | Green River, WY | Price | |
| FPL | FL. All plants, but especially Martin, Manatee, Turkey Point & Port Everglades | Price. | |
| Gaphics Packaging | Macon, GA | Price | Diamond Sales weak at this plant |
| Georgia Pacific | Brunswick, GA | Price. | |

FOR ATTORNEY
EYES ONLY

D - 0019

| Customer | City & State | Rationale | Comments |
|---|---|---|---|
| Georgia Pacific | Crosset, AR | Price. | Have used Bergemann rebuild services but went back to Diamond , because of past quality issues. They like the lubrication free carriage, but are unhappy with fact that Diamond will not sell them the hub bearings or bevel gears for the lubrication free carriage.Once we have develop a lubrication free bearing this plant may be a good opportunity for us to convert their carriages to the lubrication free design. |
| Georgia Pacific | Monticello, MS | Price. | Has the Pre-series 1 IKSD carriages and does not want any series 1 IKSD carriages. Once we have develop a lubrication free bearing this plant may be a good opportunity for us to convert their pre-series 1 IKSD's carriages to the lubrication free design. |
| Georgia Pacific | Palatka, FL | Price. | Plant has a strong union, and prefers to do they repairs in house. Consequently, winning this business will be tough. However, rumor has it that they will be reducing staff and may be forced to use an outside vender for rebuild |
| Georgia Pacific | Zackary, LA | Price. | |
| Georgia Power | GA, All plants but especially Sherer | Price | |
| Green Bay Packaging | Morrilton, AR | Price | |
| Gulf States Paper | Demopolis, AL | Price | |
| Illinois Utilites outside Chicago area | Illinois | Price | Diamond Sales weak in this area |
| Inland Paper | Bogalousa, LA | Price | |
| Inland Paper | Rome, GA | Price | |
| International Paper | Kaukauna, WI | Price | |
| International Paper | Mansfield, LA | Price | |
| International Paper | Prattsville, AL | Price | |
| International Paper | Reigelwood, NC | Price | |
| IP Roanoke | Roanoke Rapids, NC | Price | |
| Louisiana Generating. Big Cajon | New Roads, LA | Price | Have used Bergemann rebuild services but went back to Diamond , because of past quality issues. |

FOR ATTORNEY
EYES ONLY

D - 0020

| Customer | City & State | Rationale | Comments |
|---|---|---|---|
| Louisiana Petrochems | LA | Price | These customers almost always rebuild on price, but usually require a very short turn-around. Trick is finding out when outages will be and being invited to bid |
| Mead/Westvaco | Covington, VA | Price | |
| Midwest Generating, Fisk | Chicago, IL | Price, on time delivery | |
| Midwest Generating, Powerton | Pekin, IL | Price | |
| Midwestern Utilities | Iowa, Kansas,Nebraska, Missiouri, South Dakota, Minnasota | Price | Diamond Sales weak in this area |
| Mississppi Power | Watson and Daniel | Price | |
| New England & New York State Utitiies and P&P plants | New England, NY | Price | Diamond Sales weak in this area |
| New Jersey Petrochems | NJ | Price | These customers almost always rebuild on price, but usually require a very short turn-around. Trick is finding out when outages will be and being invited to bid |
| NIPSC, all Plants | IN. | Price | |
| Northwest P&P | Washington and Oregon | Price | |
| PacificCorp, Dave Johnson Plant | OR | Price | |
| Packaging Corp | Valdosta, Ga | Price | |
| PSEG Hudson | NJ | Price | |
| Rayonier | Jessup, Ga | Price | |
| Simpson Tocoma Kraft | Tacoma WA | Price | |
| Smurfit Stone | Brewton, AL | Price | |
| Smurfit Stone | Hopewell, VA | Price | |
| Southern Illinois Power Coop | Illinois | Price | |
| St John's River Power Park | Jacksonville, FL | Price | |
| Texas Genco (HP&L) | TX | Price | |

**FOR ATTORNEY
EYES ONLY**

| Customer | City & State | Rationale | Comments |
|---|---|---|---|
| Texas PetroChems | TX | Price | These customers almost always rebuild on price, but usually require a very short turn-around. Trick is finding out when outages will be and being invited to bid |
| TU Parrish | TX | Price | |
| TVA | TN, All Plants but especially Shawnee, Allen, and Gallatin | Price | |
| Weyerhaeuser | Bennettsville, SC | Price | |
| Weyerhaeuser | New Bern, NC | Price | |
| Weyerhaeuser | Oglethorpe, GA | Price | |
| Weyerhaeuser | Valiant OK | Price | |
| Xcel Energy Sherco Plant | MI | Price and on-time delivery | |

FOR ATTORNEY
EYES ONLY

EM04C8D.txt

Source folder: Notes Folders\Sent

=== Email ================================================

Sent Date: 11/10/2003 01:06:00p
Received Date: 11/10/2003 01:06:00p
From: Wayne Davidson <>
TO: Dana D. Steine <>
    James Pepper <>
Subject: Parts Info

Attached is some information that Diamond is putting out about the comparison
of Diamond versus Bergemann parts.


Wayne Davidson
Manager, Rebuild Activities
Clyde Bergemann Inc
Phone 770-557-3629
Fax 770-557-3729
email Wayne@clydebergemann.com

=== End of Email =========================================

=== Attachments ==========================================
  Parts comparison.doc
=== End of Attachments ===================================

**CONFIDENTIAL**

# EXHIBIT C

**D - 0025**

| Parts Item | DPSC Price | Competitor Price | Discussion |
|---|---|---|---|
| 1. Drum Level Gauge Glass & Gasket Set | $43.99 | ~$31. | Average life for a DPSC set is three years, compared to one year for the competitor's version. In addition, experience indicates that about 20% of competitor glass and gasket sets leak upon installation due to poor fit, requiring immediate replacement. |
| | | | **Installed Cost (normalized): DPSC = $49.67** **Competitor = ~$136.** |
| 2. IK Lance Roller Assembly | $188.59 | ~$140. | DPSC base metallurgy, hardening process, roller contour and lance tube positioning *extends the average life for DPSC assembly by two times* compared to the competitor version. |
| | | | **Installed Cost (normalized): DPSC = $643.59** **Competitor = ~$1,190.** |
| | | | In addition, the performance of this assembly has a significant impact on lance tube life; poor performance reduces lance tube life by ~40%. |
| 3. IR Screw Tubes | $1,581.33 | ~$1,195. | Average life for DPSC screw tube is 10 years, compared to about six years for the competitor's version. Frequent drive pin failures are typical for the competitor as a result of poor metallurgy and associated with premature screw tube wear. |
| | | | **Installed Cost (annualized): DPSC = $168.63** **Competitor = ~$216.67+** |

**FOR ATTORNEY EYES ONLY**

| Parts Item | DPSC Price | Competitor Price | Discussion |
|---|---|---|---|
| 4. High Efficiency Nozzles | $335. (avg) | ~$220. (avg) | Four significant improvements in DPSC nozzle technology since 1992. Current nozzles average 20% higher in efficiency than the competitor's range of nozzles, resulting in significantly better cleaning performance and/or substantially reduced steam/air consumption.<br><br>**Potential Savings up to several hundred thousand dollars per year.** |
| 5. IK Poppet Valve Turn-on Assembly | $125.39 | ~$88. | DPSC "turnbuckle" design permits adjustment without disassembling poppet valve trigger.<br><br>**Installed Cost:     DPSC = $215.39<br>Competitor = ~$223.** |
| 6. G9B Valve Stem | $73.04 | ~$60. | DPSC material and fit achieve a 10 year average live, compared to three years for the competitor's version. Additional parts required when the valve stem is replaced cost $320.15 (DPSC) or ~$288. (competitor).<br><br>**Installed Cost (annualized): DPSC = $57.40<br>Competitor = ~$176.** |
| 7. Replacement Diaphragm Poppet Valve Actuator | $17.71 | ~$12. | Superior DPSC materials as a result of OEM "Private Label" arrangement result in two year life, compared to one year for competitor version.<br><br>**Installed Cost (annualized): DPSC = $25.73<br>Competitor = ~$38.** |

FOR ATTORNEY EYES ONLY

| Parts Item | DPSC Price | Competitor Price | Discussion |
|---|---|---|---|
| 8. IK Air Seal Ring, Plate | $251.02 | ~$180. | DPSC metallurgy resists corrosion; unique geometry avoids galling or binding against the lance tube. This extends lance tube and forward sections of gear rack life by approximately 20%.<br><br>**Installed Cost (normalized): DPSC = $79.10**<br>**Competitor = ~$402.** |
| 9. Lance Tube, Croloy | $2,904.31 | ~$1,740. | DPSC material specifications, weld materials and processes, and QA/QC procedures result in mean lance tube lives about 85% longer than for comparable competitor tubes (pipe).<br><br>**Installed Cost (normalized): DPSC = $3044.31**<br>**Competitor = ~$3,550.** |

FOR ATTORNEY
EYES ONLY



Source folder: Notes Folders\Sent

=== Email ==================================================

Sent Date: 12/15/2003 01:12:00p
Received Date: 12/15/2003 01:12:00p
From: Wayne Davidson <>
TO: ZCBA Reps US All <>
CC: Hans Schwade <>
    Dana D. Steine <>
    ZCBA Field Service Group <>
    Bill Rafferty <>
    Joey Payne <>
    James Pepper <>
    Jeff Atchley <>
Subject: Diamond PowerTrain (lubrication free) Carriage Customers

At the recent sales conference several of you requested a customer list for
the Diamond PowerTrain (lubrication free) carriages.

Attached is the listing customers that I believed may have purchased the
lubrication free carriages from Diamond service centers prior to 9/30/03.
Additionally, it is my understanding that effective 4/1/03, that unless
otherwise specified, all new carriages shipped from the Diamond factory will
be the lubrication free model. Unfortunately, I do have a list of customers
who have purchased these carriages direct from the factory.

All lubrication free carriages shipped from the Diamond service centers are
painted green. Other than some lubrication free tags, I do not know if there
will be any identifying features on the lubrication free carriages shipped
from the Diamond factory.

As I mentioned in at the sales conference, there has been at least four
bearing failures on this type of carriage.  Two failed at Weyerhaeuser
Plymouth. and one each at GP Brunswick and Smurfit Stone Brewton.  Please let
me know if you learn of any other bearing failures or for that matter any
other problem associated with these carriages.


Wayne Davidson
Manager, Rebuild Activities
Clyde Bergemann Inc
Phone 770-557-3629
Fax 770-557-3729
email Wayne@clydebergemann.com

=== End of Email ========================================

=== Attachments ==========================================
  PowerTrain.Customers.xls
=== End of Attachments ======================================

CONFIDENTIAL



D - 0023

| Customer | Cust. Loc. | Type |
|---|---|---|
| AEP/AMERICAN ELECTRIC POWER | PITTSBURG, TX, 75686, US | IK-525B |
| AEP/PUBLIC SERV CO OF OKLAHOMA | OOLOGAH, OK, 74053, US | IK-525B |
| ALABAMA PINE PULP | PERDUE HILL, AL, 36470, US | IKSD |
| ALABAMA POWER COMPANY BIRMINGHAM | QUINTON, AL, 35130, US | IK-525B |
| ALABAMA RIVER PULP CO | PERDUE HILL, AL, 36470, US | IK-525B |
| BOISE CASCADE DERIDDER | DERIDDER, LA, 70634-9201, US | IKSD |
| BOISE CASCADE WALLULA | WALLULA, WA, 99363, US | IK-600 |
| CLECO POWER LLC | LENA, LA, 71447, US | IK-525B |
| DOMTAR INC ASHDOWN | ASHDOWN, AR, 71822, US | IKSD |
| FLORIDA POWER & LIGHT CO INDIANTOWN | INDIANTOWN, FL, 34956, US | IK-525B |
| GEORGIA PACIFIC CORP BRUNSWICK | BRUNSWICK, GA, 31521, US | IKSD |
| GEORGIA PACIFIC CORP CEDAR SPRINGS | CEDAR SPRINGS, GA, 31732, US | IK-525B |
| GRAPHIC PACKAGING INTERNATIONAL | MACON, GA, 31206, US | IK-525R |
| GREAT RIVER ENERGY | ELK RIVER, MN, 55330, US | IK-525B |
| GULF STATES PAPER CORP DEMOPOLIS | DEMOPOLIS, AL, 36732, US | IKSD |
| INLAND PAPERBOARD & PACKAGING ROME | ROME, GA, 30165, US | IK-525B |
| INTERNATIONAL PAPER AUGUSTA | AUGUSTA, GA, 30906, US | IK-525B |
| INTERNATIONAL PAPER NATCHEZ | NATCHEZ, MS, 39120, US | IKSD |
| INTERNATIONAL PAPER ROANOKE RAPIDS | ROANOKE RAPIDS, NC, 27870, US | IKSD |
| MEAD CORPORATION PHENIX CITY | PHENIX CITY, AL, 36868, US | IKSD |
| MEADWESTVACO-LEGACY A/P | COVINGTON, VA, 24426, US | IK-525B |
| PSI ENERGY INC - OWENSVILLE | OWENSVILLE, IN, 47665, US | IK-525B |
| RAYONIER INC   JESUP | JESUP, GA, 31545, US | IK-525R |
| SMURFIT-STONE | BREWTON, AL, 36426, US | IK-525B |
| WESTVACO TEXAS LP | EVADALE, TX, 77615, US | IK-525B |
| WEYERHAEUSER CO - FED WAY | COLUMBUS, MS, 39701, US | IKSD |
| WEYERHAEUSER CO - FED WAY | OGLETHORPE, GA, 31068, US | IK-525R |
| WEYERHAEUSER CO - FED WAY | PLYMOUTH, NC, 27962, US | IK-525B |
| WEYERHAEUSER CO COLUMBUS | COLUMBUS, MS, 39703, US | IKSD |
| WEYERHAEUSER CO VALIANT | VALLIANT, OK, 74764, US | IK-525B |
| WEYERHAEUSER MARLBORO PAPER MILL | BENNETTSVILLE, SC, 29512, US | IKSD |
| WISCONSIN PUBLIC SERVICE CO | ROTHSCHILD, WI, 54474, US | IK-525B |

FOR ATTORNEY
EYES ONLY

EXHIBIT 11

Diamond Power/Davidson - [1-20] "NT_BDC" Search (Active Link Files) (3-18-04)

| Filename | Flags | Path / Name | | Status | Date 1 | Date 2 | Date 3 |
|---|---|---|---|---|---|---|---|
| A000406.lnk | n s | Vet_pdcQuality\ D Document Control\Work Instructions | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000406.xls | n s | Vet_pdcQuality\ D Document Control\Work Instructions | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000407.lnk | n g | Vet_pdcQuality\ D Document Control\Work Instructions | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000407.xls | n g | Vet_pdcQuality\ D Document Control\Work Instructions | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000408.lnk | n - y | Vet_pdcQuality\ D Document Dases.ppt  Q:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000408.xls | n - y | Vet_pdcQuality\ D Document Dases.ppt  Q:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000607.lnk | t1 - u | Vet_pdcMarketing Y Marketing Maps\USA Pulp & Paper Map of Y:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000607.xls | t1 - u | Vet_pdcMarketing Y Marketing Maps\USA Pulp & Paper Map of Y:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000310.WV | t7 - n | Vet_pdcMarketing Y\ Marketing Maps\USA Pulp & Paper Map of Y:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000310.WV | t1 - n | Vet_pdcMarketing Y\ Marketing Maps\USA Pulp & Paper Map of Y:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 1:45 PM | 1/15/04 4:19 PM |
| A000301.lnk | E | Vet_pdcQuality\ Q:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 3:39 PM | 1/15/04 4:19 PM |
| A000408.lnk | E | Vet_pdcQuality\ Q:\ | x | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/7/03 3:39 PM | 1/15/04 4:19 PM |
| A012082.lnk | E D | Vet_pdcQuality\ Q:\ | rl_p5 | File, Deleted, Archive, Compressed | 12/5/03 3:32 PM | 11/7/03 3:39 PM | 1/15/04 4:19 PM |
| A012082.lnk | D | Vet_pdcQuality\ Q:\ | rl_p5 | File, Deleted, Archive, Compressed | 12/12/03 8:53 AM | 12/5/03 3:32 PM | 1/15/04 4:19 PM |
| A012083.lnk | D | Vet_pdcQuality\ Q:\ | aUX :WKDOKsSvM | File, Deleted, Archive, Compressed | 12/12/03 8:53 AM | 12/5/03 3:32 PM | 1/15/04 4:19 PM |
| A012083.lnk | D | Vet_pdcQuality\ Q:\ | aUX :WKDOKsSvM | File, Deleted, Archive, Compressed | 12/17/03 9:45 AM | 12/15/03 8:57 AM | 1/15/04 4:19 PM |
| A012247.lnk | D | Vet_pdcMarketing folder S ADMINT telephone List | x | File, Deleted, Archive, Compressed | 12/17/03 9:45 AM | 12/15/03 8:57 AM | 1/15/04 4:19 PM |
| A012247.lnk | D | Vet_pdcMarketing folder S ADMINT telephone List | rl_pdc | File, Deleted, Archive, Compressed | 12/17/03 9:45 AM | 12/15/03 8:59 AM | 1/15/04 4:19 PM |
| A012082.lnk | D | Vet_pdcQuality\ D Document ControlForms | rl_pdc | File, Deleted, Archive, Compressed | 12/5/03 1:47 PM | 11/12/03 3:38 PM | 1/15/04 4:19 PM |
| A012082.lnk | D | Vet_pdcQuality\ D Document ControlForms | rl_pdc | File, Deleted, Archive, Compressed | 12/17/03 9:09 PM | 11/11/03 11:41 AM | 1/15/04 4:19 PM |
| A012082.lnk | D | Vet_pdcQuality\ D Document ControlForms | rl_pdc | File, Deleted, Archive, Compressed | 12/17/03 9:09 PM | 11/11/03 11:41 AM | 1/15/04 4:19 PM |
| A010208.lnk | m5 | Vet_pdcMarketing Y drawings\40quote.pdf Y:\drawings | x | File, Deleted, Archive, Compressed | 12/17/03 9:09 PM | 11/11/03 11:41 AM | 1/15/04 4:19 PM |
| A010208.lnk | m5 | Vet_pdcMarketing Y drawings\40quote.pdf Y:\drawings | x | File, Deleted, Archive, Compressed | 12/17/03 9:09 PM | 11/11/03 11:41 AM | 1/15/04 4:19 PM |
| A010208.lnk | D / | Vet_pdcMarketing Y Calendar FlashVisi Calendar | x | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:48 AM | 1/15/04 4:19 PM |
| A010208.lnk | D / | Vet_pdcMarketing Y Calendar FlashVisi Calendar | x | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:48 AM | 1/15/04 4:19 PM |
| A010558.lnk | a r | Vet_pdcMarketing Y Calendar FlashVisi Calendar | x | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:48 AM | 1/15/04 4:19 PM |
| A010558.lnk | a r | Vet_pdcMarketing Y Calendar FlashVisi Calendar | rl | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:48 AM | 1/15/04 4:19 PM |
| A010968.Ink | g a | Vet_pdcMarketing Y' drawings | x | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:50 AM | 1/15/04 4:19 PM |
| A010968.Ink | g a | Vet_pdcMarketing Y' drawings | x | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:50 AM | 1/15/04 4:19 PM |
| A010508.lnk | p5 | Vet_pdcMarketing Y\ Marketing Maps | rl_pdc | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:50 AM | 1/15/04 4:19 PM |
| A010508.lnk | p5 | Vet_pdcMarketing Y\ Marketing Maps | rl_pdc | File, Deleted, Archive, Compressed | 12/24/03 2:05 PM | 12/5/03 11:50 AM | 1/15/04 4:19 PM |
| A010568.Ink | O | Vet_pdcMarketing Y\ PICTURES\Diamond Long Refract | nl-HS+ | File, Deleted, Archive, Compressed | 12/24/03 2:06 PM | 12/5/03 11:31 AM | 1/15/04 4:19 PM |
| A010568.Ink | O | Vet_pdcMarketing Y\ PICTURES\Diamond Long Refract | nl-HS+ | File, Deleted, Archive, Compressed | 12/24/03 2:06 PM | 12/5/03 11:31 AM | 1/15/04 4:19 PM |
| A010000.lnk | S D | Vet_pdcMarketing Y\ BROCHURE\Rst brochure acrobatConventional B | File, Deleted, Archive, Compressed | 12/24/03 2:09 PM | 12/23/03 2:09 PM | 1/15/04 4:19 PM |
| A010000.lnk | S D | Vet_pdcMarketing Y\ BROCHURE\Rst brochure acrobatConventional B | File, Deleted, Archive, Compressed | 12/24/03 2:09 PM | 12/23/03 2:09 PM | 1/15/04 4:19 PM |

| File | | | Type / Status | | | |
|---|---|---|---|---|---|---|
| A001004A.lnk | S | D | - | - | | |
| A001004A.lnk | o c | E | F - | Wk_pdcMarketing Y: BROCHURES\Final brochures acrobat\Convention\ B | File, Deleted, Active | 12/23/03 2:05 PM 12/23/03 2:03 PM 12/23/03 2:18 PM 1/15/04 4:19 PM |
| A001004A.lnk | o c | E | F - | Wk_pdcMarketing Y: TYA Proflesm\Fax Memo on Lost sale.doc  Y: | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:18 PM 12/23/03 2:19 PM 1/15/04 4:20 PM |
| A001004A.lnk | o c | E | F - | Wk_pdcMarketing Y: TYA Proflesm\Fax Memo on Lost sale.doc  Y:1 | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:18 PM 12/23/03 2:19 PM 1/15/04 4:20 PM |
| A001004A.lnk | o c | E | F - | Wk_pdcMarketing Y: TYA Proflesm\Fax Memo on Lost sale.doc  Y:1 | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:18 PM 12/23/03 2:19 PM 1/15/04 4:20 PM |
| A001004A.lnk | o c | E | F - | Wk_pdcMarketing Y: TYA Proflesm\Fax Memo on Lost sale.doc  Y:1 | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:18 PM 12/23/03 2:19 PM 1/15/04 4:20 PM |
| A001004A.lnk | o c | E | F - | Wk_pdcQuality Y: Document Control\ | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:32 PM 12/23/03 2:32 PM 1/15/04 4:20 PM |
| A001061.lnk | o c | E | F - | Wk_pdcQuality D Document Control\ | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:32 PM 12/23/03 2:32 PM 1/15/04 4:20 PM |
| A001061.lnk | o c | E | F - | Wk_pdcQuality D Document Control\ | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:32 PM 12/23/03 2:32 PM 1/15/04 4:20 PM |
| A001061.lnk | o c | E | F - | Wk_pdcQuality D Document Control\ | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:32 PM 12/23/03 2:32 PM 1/15/04 4:20 PM |
| A001060C.lnk | o c | C | D - | Wk_pdcQuality D Document Control\ | File, Deleted, Active, Compressed | 12/23/03 2:05 PM 12/23/03 2:32 PM 12/23/03 2:32 PM 1/15/04 4:20 PM |
| A001060C.lnk | o c | C | D - | Wk_pdcQuality Y: Solutions in X: Proflenwick Solutions Book | File, Deleted, Active, Compressed | 12/23/03 2:06 PM 12/23/03 2:10 PM 12/23/03 2:35 PM 1/15/04 4:20 PM |
| A001060C.lnk | o c | C | D - | Wk_pdcMarketing Y: | X | File, Deleted, Active, Compressed | 12/24/03 2:06 PM 12/23/03 2:34 PM 12/23/03 2:35 PM 1/15/04 4:20 PM |
| A001060.lnk | o c | C | - | Wk_pdcMarketing Y: Users List\ | File, Deleted, Active, Compressed | 12/24/03 2:06 PM 12/23/03 2:34 PM 12/23/03 2:35 PM 1/15/04 4:20 PM |
| A001060.lnk | o c | C | - | Wk_pdcMarketing Y: Users List\ | File, Deleted, Active, Compressed | 12/24/03 2:06 PM 12/23/03 2:34 PM 12/23/03 2:35 PM 1/15/04 4:20 PM |
| A001050.lnk | o c | C | - | Wk_pdcsales folder S: Users List\ | X | File, Deleted, Active, Compressed | 1/9/04 8:15 PM 12/23/03 3:30 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001050.lnk | o c | C | - | Wk_pdcsales folder S: Users List\ | X | File, Deleted, Active, Compressed | 1/9/04 8:15 PM 12/23/03 3:30 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001050.lnk | o c | C | - | Wk_pdcMarketing Y  X | n/-5+ Or bAi | File, Deleted, Active, Compressed | 1/9/04 8:15 PM 12/23/03 3:30 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001050.lnk | o c | C | - | Wk_pdcMarketing Y  X | n/-5+ Or bAi | File, Deleted, Active, Compressed | 1/9/04 8:15 PM 12/23/03 3:30 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001422.lnk | p l | G | - | Wk_pdcMARKETING  X | n/-5+ Or bAi O&A | File, Deleted, Active, Compressed | 1/9/04 8:15 PM 12/23/03 3:30 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001422.lnk | p l | G | - | Wk_pdcMARKETING  X | n/-5+ Or bAi O&A | File, Deleted, Active, Compressed | 1/9/04 8:15 PM 12/23/03 3:30 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001422.lnk | p l | G | - | Wk_pdcMARKETING  X | n/-5+ Or bAi | File, Deleted, Active, Compressed | 1/9/04 4:41 PM 12/23/03 3:31 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001422.lnk | p l | G | - | Wk_pdcMarketing Y  X | n/-5+ Or bAi | File, Deleted, Active, Compressed | 1/9/04 4:41 PM 12/23/03 3:31 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001422.lnk | e | G | + | Wk_pdcMarketing Y  X | n/-5+ Or bAi | File, Deleted, Active, Compressed | 1/9/04 4:41 PM 12/23/03 3:31 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001419.lnk | e | G | + | Wk_pdcMARKETING  X | rt_pdc | File, Deleted, Active, Compressed | 1/9/04 4:41 PM 12/23/03 3:31 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001419.lnk | e | G | + | Wk_pdcMarketing Y  X | rt_pdc | File, Deleted, Active, Compressed | 1/9/04 4:41 PM 12/23/03 3:31 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001419.lnk | e | G | + | Wk_pdcMarketing Y  X | rt_pdc | File, Deleted, Active, Compressed | 1/9/04 4:41 PM 12/23/03 3:31 PM 12/23/03 3:31 PM 1/15/04 4:20 PM |
| A001615.lnk | d f | - | - | Wk_pdcMarketing Y  X | rt_pdc | File, Deleted, Active | 12/23/03 2:34 PM 12/23/03 2:34 PM 12/23/03 2:34 PM 11/9/04 10:54 AM |
| CB Presentation Template Rev. 0 2003_07_28.ppt.lnk | e | h | - | WNT_PDCMARKETING  X | rt_pdc | File, Deleted, Active | 12/23/03 2:34 PM 12/23/03 2:51 PM 12/23/03 2:51 PM 11/9/04 4:20 PM |
| CB Presentation Template Rev. 0 2003_07_28.ppt.lnk | e | h | - | WNT_PDCMARKETING  X | rt_pdc | File, Deleted, Active | 11/7/03 1:44 PM 11/7/03 1:44 PM 11/7/03 1:44 PM 11/9/04 4:01 PM |
| CB Presentation Template Rev. 0 2003_07_28.ppt.lnk | e | h | - | Wk_pdcQuality D: CB Presentation Microsoft Network  D | File, Deleted, Active | 11/12/03 3:39 PM 11/7/03 1:44 PM 11/12/03 3:39 PM 11/9/04 4:01 PM |
| CB Presentation Template Rev. 0 2003_07_28.ppt.lnk | p t | C | - | Wk_pdcQuality D: CB Presentation Microsoft Network  D | File, Deleted, Active | 11/12/03 3:39 PM 11/7/03 1:44 PM 11/12/03 3:39 PM 11/9/04 4:01 PM |
| CB Presentation Template Rev. 0 2003_07_28.ppt.lnk | p t | C | - | Wk_pdcQuality D: CB Presentation Template Rev. 0 2003_07_28.ppt  C | File, Deleted, Active | 11/12/03 3:39 PM 11/7/03 1:44 PM 11/12/03 3:39 PM 11/9/04 4:01 PM |
| Company Logos on Primary Domain Controller (M_pdc).lnk | e l | C | - | Wk_pdc Microsoft Network Primary Domain Controller  A Unk_pdcCompany Logos Microsoft Network  H | File, Deleted, Active | 12/6/03 12:10 PM 12/6/03 12:10 PM 12/6/03 3:28 PM 1/15/04 4:01 PM |
| Company Logos on Primary Domain Controller (M_pdc).lnk | e l | C | - | Wk_pdc Microsoft Network Primary Domain Controller  A Unk_pdcCompany Logos Microsoft Network  H | File, Deleted, Active | 12/6/03 12:10 PM 12/6/03 12:10 PM 12/6/03 3:28 PM 1/15/04 4:01 PM |
| Company Logos on Primary Domain Controller (M_pdc).lnk | e l | C | - | Wk_pdc Microsoft Network Primary Domain Controller  A Unk_pdcCompany Logos Microsoft Network  H | File, Deleted, Active | 12/6/03 12:10 PM 12/6/03 12:10 PM 12/6/03 3:28 PM 1/15/04 4:01 PM |
| Company Logos on Primary Domain Controller (M_pdc).lnk | e | C | - | Wk_pdc Microsoft Network Primary Domain Controller  A Unk_pdcCompany Logos Microsoft Network  H | File, Deleted, Active | 12/6/03 12:10 PM 12/6/03 12:10 PM 12/6/03 3:28 PM 1/15/04 4:01 PM |
| Company Logos on Primary Domain Controller (M_pdc).lnk | h | H | - | Wk_pdc Microsoft Network Primary Domain Controller  A Unk_pdcCompany Logos Microsoft Network  H | File, Deleted, Active | 12/6/03 12:10 PM 12/6/03 12:10 PM 12/6/03 3:28 PM 1/15/04 4:01 PM |
| Company Logos on Primary Domain Controller (M_pdc).lnk | h | H | - | Wk_pdc Microsoft Network Primary Domain Controller  A Unk_pdcCompany Logos Microsoft Network  H | File, Deleted, Active | 12/6/03 12:10 PM 12/6/03 12:10 PM 12/6/03 3:28 PM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | i s | - | - | Wk_pdcMarketing Y: Customer Mailing Lists\ | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | i s | - | - | Wk_pdcMarketing Y: Customer Mailing Lists\ | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | i s | - | - | Wk_pdcMarketing Y: Customer Mailing Lists\ | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | m s | - | - | Wk_pdcMarketing Y: Customer Mailing Lists  rt_pdc | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | m s | - | - | Wk_pdcMarketing Y: Customer Mailing Lists  rt_pdc | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Forms.lnk | m s | - | F - | Wk_pdcMarketing Y: ADMIN\Email Information\  rt_p | File, Deleted, Active | 12/19/03 3:12 PM 12/19/03 3:12 PM 12/19/03 3:12 PM 1/15/04 4:01 PM |
| Email Information.lnk | i s | - | F - | Wk_pdcsales folder S: ADMIN\Email Information\  rt_p | File, Deleted, Active | 12/19/03 3:12 PM 12/19/03 3:12 PM 12/19/03 3:12 PM 1/15/04 4:01 PM |
| Email Information.lnk | i s | - | F - | Wk_pdcsales folder S: ADMIN\Email Information\  rt_p | File, Deleted, Active | 12/19/03 3:12 PM 12/19/03 3:12 PM 12/19/03 3:12 PM 1/15/04 4:01 PM |
| Email Information.lnk | o n | - | F - | Wk_pdcsales folder S: ADMIN\Email Information\  rt_p | File, Deleted, Active | 12/19/03 3:12 PM 12/19/03 3:12 PM 12/19/03 3:12 PM 1/15/04 4:01 PM |
| Email Information.lnk | o n | - | - | Wk_pdcsales folder S: ADMIN\Email Information\  rt_p | File, Deleted, Active | 12/19/03 3:12 PM 12/19/03 3:12 PM 12/19/03 3:12 PM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | o n | G + | - | Wk_pdcMarketing Y: Customer Mailing Lists  rt_pdc | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | o n | G + | - | Wk_pdcMarketing Y: Customer Mailing Lists  rt_pdc | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Customer Mailing Lists.lnk | i s | - | - | Wk_pdcMarketing Y: Customer Mailing Lists  rt_pdc | File, Deleted, Active | 12/5/03 11:48 AM 12/5/03 11:48 AM 12/5/03 11:48 AM 1/15/04 4:01 PM |
| Forms.lnk | m s | - | D - | Wk_pdcQuality D Document Control\Forms  rt_pdc | File, Deleted, Active | 12/17/03 1:41 PM 12/17/03 1:41 PM 12/17/03 1:41 PM 1/15/04 4:01 PM |
| Forms.lnk | m s | - | D - | Wk_pdcQuality D Document Control\Forms  rt_pdc | File, Deleted, Active | 12/17/03 1:41 PM 12/17/03 1:41 PM 12/17/03 1:41 PM 1/15/04 4:01 PM |
| Forms.lnk | m s | - | D - | Wk_pdcQuality D Document Control\Forms  rt_pdc | File, Deleted, Active | 12/17/03 1:41 PM 12/17/03 1:41 PM 12/17/03 1:41 PM 1/15/04 4:01 PM |
| Forms.lnk | o k | - | D - | Wk_pdcQuality D Document Control\Forms  rt_pdc | File, Deleted, Active | 12/17/03 1:41 PM 12/17/03 1:41 PM 12/17/03 1:41 PM 1/15/04 4:01 PM |
| K Solutions Book.lnk | o k | - | - | Wk_pdcQuality Y: Solutions in X: Proflenwick Solutions Book | File, Deleted, Active | 12/23/03 2:16 PM 12/23/03 2:16 PM 12/23/03 2:16 PM 1/15/04 4:01 PM |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| USA.TIF.lnk | lnk | F | · | Wt_pdc\Marketing Y Marketing Maps\USA.TIF  Y i M a r k e t i n g | File, Deleted, Active | 12/23/03 2:12 PM | 12/23/03 2:12 PM | 1/15/04 4:01 PM |
| USA.TIF.lnk | lnk | F | · | Wt_pdc\Marketing Y Marketing Maps\USA.TIF  Y i M a r k e t i n g | File, Deleted, Active | 12/23/03 2:12 PM | 12/23/03 2:12 PM | 1/15/04 4:01 PM |
| USA.TIF.lnk | lnk | F | · | Wt_pdc\Marketing Y Marketing Maps\USA.TIF  Y i M a r k e t i n g | File, Deleted, Active | 12/23/03 2:12 PM | 12/23/03 2:12 PM | 1/15/04 4:01 PM |
| VI2E.pdf.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:34 PM | 12/23/03 2:34 PM | 1/15/04 4:01 PM |
| VI2E.pdf.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.pdf  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:34 PM | 12/23/03 2:34 PM | 1/15/04 4:01 PM |
| VI2E.pdf.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.pdf  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:34 PM | 12/23/03 2:34 PM | 1/15/04 4:01 PM |
| VI2E.pdf.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.pdf  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:34 PM | 12/23/03 2:34 PM | 1/15/04 4:01 PM |
| VI2E.pdf.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.pdf  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:34 PM | 12/23/03 2:34 PM | 1/15/04 4:01 PM |
| VI2E.lnk.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:35 PM | 12/23/03 2:35 PM | 1/15/04 4:01 PM |
| VI2E.lnk.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:35 PM | 12/23/03 2:35 PM | 1/15/04 4:01 PM |
| VI2E.lnk.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:35 PM | 12/23/03 2:35 PM | 1/15/04 4:01 PM |
| VI2E.lnk.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:35 PM | 12/23/03 2:35 PM | 1/15/04 4:01 PM |
| VI2E.lnk.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:35 PM | 12/23/03 2:35 PM | 1/15/04 4:01 PM |
| VI2E.lnk.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:35 PM | 12/23/03 2:35 PM | 1/15/04 4:01 PM |
| VI2E.lnk.lnk | lnk | · | · | Wt_pdc\sales folder S_Users L\int\VI2E.lnk  S · i U s e r s  L | File, Deleted, Active | 12/23/03 2:35 PM | 12/23/03 2:35 PM | 1/15/04 4:01 PM |
| Unallocated Clusters | xxyxx | · | · | 14_2  Eyyy· A UZNK_pdc\NETLOGON Microsoft Network  I_m  yyyx RkE m·A | File, Unallocated Clusters | | 12/23/03 2:35 PM | 1/15/04 4:01 PM |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER                    )
INTERNATIONAL, INC.,             )
                                 )
            Plaintiff,           )
                                 )        CIVIL ACTION
v.                               )        FILE NO. _____
                                 )
CLYDE BERGEMANN, INC.,           )
                                 )
            Defendant.           )

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing Plaintiff's Motion

for Temporary Restraining Order and Preliminary Injunction on all parties to this

action by hand delivery addressed as follows:

| Hans Schwade | Jeffrey D. Mokotoff |
|---|---|
| Chief Executive Officer | Leanne C. Mehrman |
| Clyde Bergemann, Inc. | Ford & Harrison |
| 4015 Presidential Pkwy | 1275 Peachtree Street, N.E. |
| Atlanta, Georgia 30340 | Suite 600 |
| | Atlanta, GA 30309 |

This the 14th day of June, 2004.

Warren R. Hall Jr.
Georgia Bar No. 319405

- 30 -